07-3658-cv
LLC v. Hennessee

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Argued:  January 16, 2009          Decided:  July 14, 2009)

Docket No. 07-3658-cv

_____

SOUTH CHERRY STREET, LLC,

Plaintiff-Appellant,

- v. -

HENNESSEE  GROUP  LLC,  ELIZABETH  LEE  HENNESSEE,
CHARLES A. GRADANTE,

Defendants-Appellees.

_____

Before:  JACOBS, Chief Judge, KEARSE and HALL, Circuit Judges.

Appeal from so much of a judgment of the United States District Court for the Southern District of New York, Colleen McMahon, Judge, as dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), contract and securities fraud claims against investment advisors for failure to disclose that hedge fund recommended by defendants was part of a Ponzi scheme. See In re Bayou Hedge Fund Litigation, 534 F.Supp.2d 405 (2007).

Affirmed.

TED PORETZ, New York, New York (Theo J. Robins, Derek Care, Bingham McCutchen, New York, New York, on the brief), for Plaintiff-Appellant.

BENNETT FALK, Miramar, Florida (Matthew Wolper, Bressler, Amery & Ross, Miramar, Florida, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiff South Cherry Street, LLC ("South Cherry"), appeals from so much of a judgment of the United States District Court for the Southern District of New York, Colleen McMahon, Judge, as dismissed its claims against defendants Hennessee Group LLC ("Hennessee Group"), et al., for breach of contract and for violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), in connection with Hennessee Group's failure to learn and disclose that a hedge fund in which South Cherry invested, on Hennessee Group's recommendation, was part of a Ponzi scheme. The district court dismissed South Cherry's breach-of-contract claim pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that it is barred by the New York Statute of Frauds, see N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2001); the court dismissed the securities fraud claim on the ground that the Amended Complaint (or "Complaint") failed to plead scienter in the manner required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. South Cherry challenges these rulings on appeal. For the reasons that follow, we affirm.

## I. BACKGROUND

The present action concerns an investment made by South Cherry in Bayou Accredited Fund, L.L.C. ("Bayou Accredited"), on

the recommendation of Hennessee Group. The following description is based on the nonconclusory factual allegations in South Cherry's Complaint, which we accept as true for purposes of reviewing the dismissal pursuant to Fed. R. Civ. P. 12(b)(6), along with the Hennessee Hedge Fund Advisory Group Investor Presentation ("Hennessee Investor Presentation" or "Presentation") containing the representations described in the Complaint (see Declaration of Fred Groothuis dated April 25, 2007, Exhibit A).

A. Hennessee Group's Pre-Investment Presentation to South Cherry

Hennessee Group (or "HG") is an advisor with respect to investments in hedge funds, i.e., private pools of capital collected from qualified investors. Defendants Elizabeth Lee Hennessee and Charles A. Gradante are HG's managing principals. HG describes itself as the "Industry Leader: the most recognized hedge fund consulting firm in the industry," whose principals have testified before Congress on hedge fund issues. In 2001, South Cherry was inexperienced in investing in hedge funds. (See Complaint ¶ 22.) At the request of one of South Cherry's creditors, HG made a presentation to South Cherry and its principal, Fred Groothuis, as to the HG process for evaluating hedge funds.

The Hennessee Investor Presentation that was sent to South Cherry stated that "[h]edge funds provide superior returns relative to risk"; it emphasized HG's unique experience and expertise in evaluating hedge funds, stating that HG had "150

direct relationships with hedge funds," had "[p]ersonal and professional relationships with all key managers in the industry," and "review[ed] 550 [hedge funds] per month"; and it extolled, _inter alia_, what HG called its "proprietary data base and analytics," its five-phase "unique due diligence process," and its "[c]redibility" with "investors and industry professionals." According to the Presentation, HG considered only "Hedge Funds With 3 Years Audited Track Record"; its due diligence process with respect to such funds included the following five levels of scrutiny prior to its recommendation of such a fund for investment: (1) collection of information about the fund's manager; (2) assessment of the fund's "Experience," "Credibility," and "Transparency"; (3) interviews of hedge fund "[p]ersonnel from the top down" at the fund's offices to give HG a sense of "overall professionalism, attitude and depth of organization"; (4) study of the fund's "[i]ndividual positions," with an emphasis on its long, short, cash, and derivative positions, as well as any "[o]ff balance sheet transactions"; and (5) review of "audited financial statements," checks of the fund's key personnel's references, confirmation of the fund's prime banking relationship, and measures to "Verify Auditor." The Presentation also stated that after a decision to invest in a given hedge fund, "[m]onitoring the investment, once it is made, is equally important," and that Hennessee Group provided "[o]ngoing and continuous quantitative and qualitative analysis" and conducted "On-Going Due Diligence."

After receiving the Presentation from Hennessee Group, South Cherry and HG entered into an oral arrangement whereby

> Hennessee Group contracted with South Cherry that it would recommend to South Cherry suitable hedge fund investments which had passed every stage of Hennessee Group's detailed and rigorous five step due diligence process. In addition, Hennessee Group promised South Cherry that it would continue to perform on-going due diligence on investments South Cherry would make in reliance on Hennessee Group recommendations. In exchange, South Cherry agreed to pay Hennessee Group an annual commission of 1% of each hedge fund investment South Cherry made as a result of a Hennessee Group recommendation.

(Complaint ¶ 45.)

B.  South Cherry's Investment in Bayou Accredited

One of the hedge funds recommended to South Cherry by Hennessee Group was Bayou Accredited, whose principals included Samuel Israel III and Daniel Marino (see Complaint ¶ 9). Hennessee Group presented to South Cherry a "'Biography'" of Israel representing that from 1992 to 1996, Israel had been "'head trader for Omega Advisors,' . . . . one of the hedge fund industry's largest and most successful funds," and had "'manag[ed] assets exceeding $4 billion for Leon Cooperman,'" who was "widely described as a 'legendary' trader." (Id. ¶ 29.) Hennessee Group represented that "at Omega, Israel was responsible for all equity and financial futures execution, and shared responsibility for hedging the portfolio using futures and options." (Id. (internal quotation marks omitted).)

In 1996, Israel and Marino formed Bayou Fund, LLC ("Bayou Fund"); in or about January 2003, Israel and Marino replaced Bayou

Fund with several Bayou Family Funds, including Bayou Accredited. (See id. ¶ 23.)

> In recommending an investment in Bayou [Accredited] to South Cherry, Hennessee Group represented in writing to Groothuis and South Cherry, among other things, that the predecessor[,] Bayou Fund[,] . . . had a greater than 19% annualized return since inception, that it was profitable in 78% of the months since its inception, and that it had accomplished all of this at relatively low risk relative to the broader marketplace.

(Id. ¶ 26.) Further,

> [a]s part of its investment recommendation to Groothuis and South Cherry, Hennessee Group also provided South Cherry with six years of written monthly performance figures for Bayou Fund. Net of all fees, Hennessee Group represented to South Cherry that Bayou Fund's annual performance between 1997 and 2002 ranged from a 7.05% gain in 2001 to a 21.04% gain in 1999 to a high water gain of 32.52% in 1997.

(Id. ¶ 28.)

In reliance on Hennessee Group's representations and recommendations, "and in specific reliance on [South Cherry's] understanding that Bayou [Accredited] had passed all stages of Hennessee Group's due diligence process," South Cherry invested in Bayou Accredited. (Complaint ¶ 32.) The Complaint states that South Cherry invested a total of "$2.9 million" [sic - $2.0 million?] in Bayou Accredited from "March 3, 2003 through June 1, 2003," that it "withdrew $1.75 million" in the spring of 2004, and that it "invested another $900,000" "on or about October 5, 2004 . . . for a total net investment of $1.15 million." (Id.) From the spring of 2003 until the spring of 2005, Hennessee Group sent South Cherry monthly reports as to the status of its investment in Bayou Accredited, the last of which "reported to South Cherry that

- 6 -

its $1.15 million had appreciated to approximately $1.5 million." (Id. ¶ 33.)

The Complaint alleged that in fact, however, as revealed in a September 2005 SEC report and an SEC action against the Bayou funds' principals, Bayou Accredited was part of a Ponzi scheme. (See, e.g., Complaint ¶¶ 33-35.) According to the SEC, Israel and Marino had begun to divert moneys from all members of the Bayou Family Funds in 2003, and they had essentially stopped trading in those accounts and transferred all of those funds' assets to other accounts in April 2004. (See Complaint ¶¶ 34, 35; see also id. ¶ 31 (quoting the SEC as asserting that "shortly after its inception in 1996, [Bayou] began to sustain large losses from trading and ... Israel and Marino, and ... a former Bayou principal, began lying to investors regarding the Fund's performance and the value of investors' accounts. Defendants Israel and Marino also began to misappropriate and dissipate millions of dollars of investor monies from the Fund and, beginning in 2003, the four successor Funds." (internal quotation marks omitted) (alterations in Complaint)).) All of the Bayou Family Fund principals were eventually convicted, upon their pleas of guilty, of securities fraud. (See id. ¶ 37.)

In July 2005, Israel had written to Bayou Family Fund investors to say that the funds would be liquidated and that each investor would receive distributions in August; no distributions were ever made. South Cherry lost its entire remaining $1.15 million investment in Bayou Accredited. (See Complaint ¶ 36.)

- 7 -

The SEC reported that "Bayou Fund in fact lost millions of dollars in every single year it traded." (Complaint ¶ 28.) Thus, "[t]he figures Hennessee Group provided to South Cherry were all false, showing profits where there were instead large losses." (Id.) In fact, the Complaint alleged, all of the above representations by Hennessee Group as to Israel's background and the performance of Bayou Fund were false. (See, e.g., id. ¶¶ 23, 26, 28-30.) "Israel was never 'head trader' for Omega Advisors, and never held any position remotely comparable"; rather, the "'legendary'" Leon Cooperman "has since described Israel as a mere 'order taker.'" (Id. ¶¶ 29, 30.) And Bayou Fund, having "consistently lost money trading in securities and options, . . . created trading profits out of whole cloth in order to mask that fact." (Id. ¶ 26). Further, "[i]n order to hide th[e] fact" of those losses, Israel and Marino in or around 1998 fired Bayou Fund's independent auditor, Hertz Herson & Co. ("HHCO"), and replaced it with a firm called Richmond, Fairfield & Associates ("Richmond Fairfield") (id. ¶ 23), a firm that the Complaint alleged "was not a genuine auditor" (id. ¶ 27), "was not independent" because its principal was Marino (id.), and "never did any auditing" (id.). Despite the fact that HHCO had "stopped auditing Bayou Fund in 1998, and never audited any of the Bayou Family Funds once they were established in 2003, Hennessee Group represented to South Cherry that Bayou [Accredited], and the Bayou Family Funds, were audited by HHCO." (Id. ¶ 23.)

The Complaint alleged that Hennessee Group could not have performed any real due diligence in 2003, for if it had, it would have discovered, <u>inter alia</u>, that Israel, prior to forming Bayou Fund, had been a mere clerk, that HHCO had not been the auditor for any of the Bayou-related funds since 1998, and that the new auditor was not independent because it was owned by Marino, a Bayou Fund principal. (<u>See</u>, <u>e.g.</u>, Complaint ¶¶ 24, 28, 30.) Thus, "Hennessee Group had no reasonable basis to credit" the Bayou Fund financial figures "and was accordingly--at best-- grossly negligent or reckless in passing them on to investors like South Cherry." (Complaint ¶ 28.)

C.   <u>The Decision of the District Court</u>

Following the disclosures as to the Ponzi-scheme nature of the Bayou funds, South Cherry commenced the present action, asserting, to the extent pertinent to this appeal, a breach-of- contract claim against Hennessee Group for failure to perform the promised due diligence, and claims of securities fraud under § 10(b) and Rule 10b-5 against Hennessee Group--and under § 20 of the 1934 Act against Elizabeth Lee Hennessee and Gradante as control persons of HG, <u>see</u> 15 U.S.C. § 78t--for misrepresenting the financial status and performance of the Bayou funds. Hennessee Group moved to dismiss the breach-of-contract claim pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that it was barred by the New York Statute of Frauds; all of the defendants moved to dismiss the securities fraud claims pursuant to Rule

- 9 -

12(b)(6) on the ground, <u>inter alia</u>, that the Complaint failed to plead scienter in accordance with the requirements of the PSLRA.

In an opinion reported <u>sub nom</u>. <u>In re Bayou Hedge Fund Litigation (South Cherry Street LLC v. Hennessee Group LLC)</u>, 534 F.Supp.2d 405 (2007), the district court granted the motions to dismiss. The court found that the oral agreement between South Cherry and Hennessee Group was a contract of "indefinite duration," as "[n]o termination provision, express or implied" was alleged. 534 F.Supp.2d at 419. The court noted that although it could be said that performance of the contract would be completed when South Cherry sold its HG-recommended hedge fund holdings, such completion could occur only at the option of South Cherry; because Hennessee Group could not perform its obligations within one year unless South Cherry exercised that option, the court concluded that the agreement was unenforceable under N.Y. Gen. Oblig. Law § 5-701(a)(1). <u>See</u> 534 F.Supp.2d at 420.

The district court ruled that South Cherry's securities fraud claim, <u>i.e.</u>, "that [HG] acted recklessly when it failed to uncover the Bayou fraud after it promised to conduct due diligence on Bayou Accredited," <u>id</u>. at 414, should be dismissed for lack of any indication of scienter. It concluded that HG's alleged failure to perform due diligence did not establish recklessness in the sense that § 10(b) and Rule 10b-5 require, because that failure did not establish either that HG knew Bayou Accredited was part of a Ponzi scheme or that HG intended to deceive South Cherry. <u>See</u> 534 F.Supp.2d at 417.

- 10 -

## II. DISCUSSION

On appeal, South Cherry contends that the district court erred in dismissing both its contract claim and its securities fraud claim. We review dismissals pursuant to Rule 12(b)(6) de novo, see, e.g., Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008), assuming all "well-pleaded factual allegations" to be true, and "determin[ing] whether they plausibly give rise to an entitlement to relief," Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("Iqbal"); see Fed. R. Civ. P. 8(a)(2) (complaint must contain "a short and plain statement" showing that the plaintiff "is entitled to relief"). We also review de novo a dismissal for failure to state a claim in accordance with the heightened pleading standards imposed by the PSLRA, discussed in Part II.B. below. See generally Faulkner v. Beer, 463 F.3d 130, 133-34 (2d Cir. 2006); Novak v. Kasaks, 216 F.3d 300, 305 (2d Cir. 2000) ("Novak"). Applying these standards to South Cherry's claims, we see no error in the rulings of the district court.

## A. The Contract Claim

New York's Statute of Frauds provides, in pertinent part, as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

> 1. By its terms is not to be performed within one year from the making thereof . . . .

N.Y. Gen. Oblig. Law § 5-701(a)(1). This provision requires answers to one or both of the following questions: (1) whether the agreement is reflected in a writing signed by the party against which enforcement is sought, and (2) if it is not, whether the agreement is one described by the statute.

There is no dispute here that the answer to the first question is negative. Although South Cherry's Complaint alleged that "Hennessee Group . . . promised South Cherry in writing that it would perform both extensive pre-recommendation and post-recommendation ongoing due diligence" (Complaint ¶ 7 (emphasis added)), the writing to which South Cherry refers was a unilateral presentation by HG, rather than a contract. South Cherry does not contend that it alleged there was any writing signed by Hennessee Group containing the terms of the agreement that South Cherry sought to enforce; it merely argues that the district court erred in ruling that the Statute of Frauds was applicable to "the oral contract pleaded in the . . . Complaint" (South Cherry brief on appeal at 7 (emphasis added); see also id. at 15 ("South Cherry alleged an oral agreement whereby HG would provide South Cherry with hedge fund recommendations and due diligence, in exchange for which South Cherry would pay a 1% fee for each year it held a recommended investment." (emphasis added))).

The disputed question is whether the alleged oral agreement is within the scope of § 5-701(a)(1). Historically,

courts generally held that this provision of the Statute of Frauds was "limited . . . to those contracts only which by their very terms have absolutely no possibility in fact and law of full performance within one year," D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 454, 483 N.Y.S.2d 164, 165 (1984) ("Boening") (citing 2 Corbin, Contracts § 444 (1950); 3 Williston, Contracts § 495 (3d ed. 1960)), making the key question "'whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year,'" Boening, 63 N.Y.2d at 454, 483 N.Y.S.2d at 165 (quoting Warner v. Texas & Pacific Ry., 164 U.S. 418, 434 (1896)). The New York Court of Appeals had ruled that "'if the obligation of the contract is not, by its very terms, or necessary construction, to endure for a longer period than one year, it is a valid agreement, although it may be capable of an indefinite continuance,'" Boening, 63 N.Y.2d at 454-55, 483 N.Y.S.2d at 166 (quoting Trustees of First Baptist Church v. Brooklyn Fire Insurance Co., 19 N.Y. 305, 307 (1859)).

The principle that this aspect of the Statute of Frauds encompasses only those contracts that "by their very terms have absolutely no possibility in fact and law of full performance within one year," Boening, 63 N.Y.2d at 454, 483 N.Y.S.2d at 165, has not, however, been applied literally. In Shirley Polykoff Advertising, Inc. v. Houbigant, Inc., 43 N.Y.2d 921, 403 N.Y.S.2d 732 (1978), for example, the plaintiff alleged an oral agreement pursuant to which it had designed an advertisement for the

- 13 -

defendant, for which the defendant agreed to pay the plaintiff $5,000 for "every year" that the defendant used the advertisement. If the defendant had paid the plaintiff $5,000 and used the advertisement only within one year of the making of the agreement, performance by both sides would, literally, have been completed within one year. But under the agreement, the defendant had the right to use the design in perpetuity. Thus, although the defendant was not obligated to use the advertisement in any given year, its non-use in any given year did not extinguish its obligation to pay if it used the advertisement in any subsequent year. Accordingly, the possibility existed that the agreement would not be performed within one year; the duration of the defendant's right and obligation was thus unlimited; and the court held that enforcement of the agreement was barred by the Statute of Frauds. See 43 N.Y.2d at 921-22, 403 N.Y.S.2d at 733; see also Martocci v. Greater New York Brewery, 301 N.Y. 57, 63, 92 N.E.2d 887, 889 (1950) (finding an oral agreement to be within the statute, even though the defendant's liability depended on the placing of orders by a third party, which could have ceased within one year).

In Boening itself, the plaintiff alleged an oral agreement in which the defendant, a prime distributor of "Yoo-Hoo" chocolate drink (a) agreed to grant the plaintiff's predecessors the exclusive right to distribute Yoo-Hoo in a particular area of New York if they ceased distribution of a competitor's chocolate drink, and (b) agreed that the predecessors' exclusive

- 14 -

subdistributorship "would continue 'for as long as they satisfactorily distributed the product, exerted their best efforts and acted in good faith.'" 63 N.Y.2d at 452, 483 N.Y.S.2d at 164. The Boening Court concluded that these terms, reasonably construed, necessarily meant that "the oral agreement between the parties called for performance of an indefinite duration and could only be terminated within one year by its breach during that period. As such, the agreement fell within the Statute of Frauds and was void." Id. at 457, 483 N.Y.S.2d at 167 (emphases added).

If, however, an oral agreement expressly provides that it may permissibly be terminated within one year by either party, such a termination is considered performance, rather than a breach; and such an agreement is not within the Statute of Frauds. See, e.g., Blake v. Voight, 134 N.Y. 69, 72, 31 N.E. 256, 256-57 (1892). South Cherry, arguing that the district court erred in finding the Statute of Frauds applicable here on the ground that only South Cherry could end the contract within one year without a breach, relies on Boening for the proposition that an oral agreement is not within the Statute of Frauds "'[w]here one or both parties have [] an explicit option to terminate their agreement within one year.'" (South Cherry brief on appeal at 14 (quoting Boening, 63 N.Y.2d at 456, 483 N.Y.S.2d at 167 (emphasis and alteration in brief)).) Boening did so state; but as the court in Huebener v. Kenyon & Eckhardt, Inc., 142 A.D.2d 185, 534 N.Y.S.2d 952 (1st Dep't 1988) ("Huebener"), observed, "[s]ignificantly, in distinction to other rules set forth in

[Boening's] review of the existing authorities, this sentence [in Boening] is not followed by any citation of authority," Huebener, 142 A.D.2d at 191, 534 N.Y.S.2d at 956; and we note that the only cases that Boening cited subsequently in which only one party had an option to terminate and the oral agreement was held to be outside the Statute of Frauds were cases in which that option belonged to the defendant, see Boening, 63 N.Y.2d at 456-57, 483 N.Y.S.2d at 167 (citing Coinmach Industries Corp. v. Domnitch, 37 N.Y.2d 889, 378 N.Y.S.2d 370 (1975), and North Shore Bottling Co. v. C. Schmidt & Sons, Inc., 22 N.Y.2d 171, 292 N.Y.S.2d 86 (1968)).

In North Shore Bottling, the New York Court of Appeals held that an oral agreement giving the defendant an express option to terminate was not within the Statute of Frauds; but it noted that an agreement would be within the Statute if instead the "option to terminate was solely in [the] plaintiff, the party seeking to enforce the agreement, and not in the party to be charged." 22 N.Y.2d at 177 n.3, 292 N.Y.S.2d at 90 n.3 (emphasis in original) (citing, inter alia, Belfert v. Peoples Planning Corp. of America, 11 N.Y.2d 755, 226 N.Y.S.2d 693 (1962)). Thus, the New York courts have held that the principle announced in Blake v. Voight, i.e., that an oral contract is not made unenforceable by the Statute of Frauds if by its express terms, it is terminable by either party within one year, is not applicable where only the plaintiff has that option. See, e.g., Americana Petroleum Corp. v. Northville Industries Corp., 200 A.D.2d 646,

- 16 -

647, 606 N.Y.S.2d 906, 907 (2d Dep't 1994); <u>Huebener</u>, 142 A.D.2d at 189-91, 534 N.Y.S.2d at 955-56; <u>Sawyer v. Sickinger</u>, 47 A.D.2d 291, 295, 366 N.Y.S.2d 435, 438 (1st Dep't 1975)). The rationale is that

> where the right to cancel or terminate is limited unilaterally to plaintiff[,] . . . [the] defendant's liability endures indefinitely, subject only to the uncontrolled voluntary act of the party who seeks to hold defendant. Under such circumstances it is illusory, from the point of view of defendant, to consider the contract terminable or performable within one year. And it is to the party to be charged, alone, namely the defendant, that the statute is designed to provide protection from fraud and perjury.

<u>Belfert v. Peoples Planning Corp. of America</u>, 22 Misc.2d 753, 756, 199 N.Y.S.2d 839, 842 (Sup. Ct. N.Y. Co. 1959) (internal quotation marks omitted), <u>aff'd</u>, 11 A.D.2d 760, 760, 202 N.Y.S.2d 101, 101 (1st Dep't 1960) (a "contract [is] one not performable within a year" where "[t]he oral options [are] exercisable by the [plaintiff-]appellant alone"), <u>aff'd without opinion</u>, 11 N.Y.2d 755, 226 N.Y.S.2d 693 (1962). Accordingly, our Court has recognized that under New York law, an oral agreement that is not by its terms to be fully performed within one year falls within the Statute of Frauds if the option to terminate rests with the plaintiff alone. See <u>Zaitsev v. Salomon Bros.</u>, 60 F.3d 1001, 1003 (2d Cir. 1995) ("if performance within one year depends upon an act solely within the control of the party seeking to enforce the oral agreement, the Statute of Frauds remains applicable").

Thus, South Cherry's contention that the district court erred as a matter of law in ruling that the Statute of Frauds is

- 17 -

applicable where only the plaintiff has the option, without a breach, to end the contract within one year, is without merit.

South Cherry also seeks to take the alleged oral agreement between itself and Hennessee Group outside the Statute of Frauds by contending (a) that HG had an option to terminate (see South Cherry brief on appeal at 17), (b) that HG's obligations under the agreement could have ended within one year as a result of the collapse of a hedge fund in which South Cherry invested (see id.), and (c) that its arrangement with HG consisted not of a single contract of indefinite duration, but rather of a series of contracts, each of which was capable of being performed in a year (see id. at 17-19). These contentions too are meritless.

South Cherry's contention that Hennessee Group had the right to terminate the alleged agreement within one year at will, "merely by recommending that the investor sell an investment" (South Cherry brief on appeal at 17), borders on the frivolous. Recommendations are not commands. Although South Cherry states that it would have been unreasonable for it not to follow such a recommendation (see South Cherry reply brief on appeal at 4), the fact remains that the right to decide whether to sell belonged to South Cherry and South Cherry alone. And the Complaint alleged that "Hennessee Group promised South Cherry that it would continue to perform on-going due diligence" on HG-recommended funds invested in by South Cherry. (Complaint ¶ 45.) Thus, according to the Complaint's description of the agreement, HG could not fully perform its obligations merely by recommending the sale of a

- 18 -

previously recommended fund; if South Cherry chose to continue to invest in that fund, HG could end the agreement only by breaching it.

Nor is there merit in South Cherry's contention that the Statute of Frauds did not apply because "a hedge fund could go out of business within a year, an event which would necessarily terminate the agreement between South Cherry and HG" (South Cherry brief on appeal at 17). The Complaint contains no allegation that the parties agreed that the contract would end upon dissolution of a hedge fund. Nor can such a provision reasonably be inferred, given, inter alia, that South Cherry, on HG's recommendations, invested in more than one such fund (see, e.g., Complaint ¶¶ 8, 25, 30). The alleged agreement provides no basis for either an inference that if any one of the HG-recommended funds in which South Cherry invested failed, Hennessee Group would be relieved of its obligation to perform ongoing due diligence on the other HG-recommended funds in which South Cherry invested, or an inference that if any one such fund failed, South Cherry would be required to sell all of its other HG-recommended funds.

Finally, we reject South Cherry's contention that "[i]t has long been the law in New York that an agreement of the type alleged in the Amended Complaint is 'a series of . . . independent contracts,' each of which could be performed within one year." (South Cherry brief on appeal at 17 (citing Nat Nal Service Stations, Inc. v. Wolf, 304 N.Y. 332, 337, 107 N.E.2d 473, 474 (1952) ("Nat Nal") (emphasis ours)).) Nat Nal involved an

- 19 -

arrangement between a plaintiff gas station owner and defendant gasoline distributors; the arrangement was that if the plaintiff would order its gasoline through the defendants and if the defendants accepted those orders, the defendants would give the plaintiff a discounted price. The court noted (a) that the plaintiff was not obligated to place any order with the defendants, and (b) that if the plaintiff did place an order, the defendants were not obligated to accept it. Thus, the agreement "was clearly one at will and for no definite or specific time and thus by its terms did not of necessity extend beyond one year from the time of its making." 304 N.Y. at 336, 107 N.E.2d at 475. The court concluded that "[w]e are confronted with an alleged contract by the terms of which neither party was bound to do anything at any time, and consequently there is nothing in its terms to bring it within the Statute of Frauds." Id. at 337, 107 N.E.2d at 475. The arrangement in Nat Nal bears no resemblance to the contract alleged here, in which (a) Hennessee Group agreed to perform due diligence before recommending a hedge fund to South Cherry, (b) South Cherry, upon investing in any HG-recommended fund, became obligated to pay HG annually 1% of the amount invested in that fund for so long as South Cherry held that investment, and (c) Hennessee Group agreed to perform continuing due diligence with respect to any such fund as long as it was held by South Cherry.

In sum, we conclude that because the possibility of performance of the alleged oral agreement within one year depended solely on the will and actions of South Cherry, the party seeking

to enforce the agreement, the district court correctly ruled that South Cherry's contract claim was barred by the Statute of Frauds.

B. The Securities Fraud Claims

1. The Element of Scienter

To state a claim on which relief can be granted under § 10(b) and Rule 10b-5, a plaintiff must plead, inter alia, that in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter. See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318, 321 (2007); Chill v. General Electric Co., 101 F.3d 263, 265 (2d Cir. 1996) ("Chill"); In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 264 (2d Cir. 1993), cert. denied, 511 U.S. 1017 (1994). The Supreme Court has defined scienter as "'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).

Prior to the enactment of the PSLRA, this Court had held that in order to plead an intent to deceive, the complaint must allege facts giving rise to "a strong inference of fraudulent intent," Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995); see, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); In re Time Warner Inc. Securities Litigation, 9 F.3d at 268, and that such an inference could be drawn from allegations of facts showing that the defendant had

both motive and opportunity to commit fraud, see, e.g., Acito v. IMCERA Group, Inc., 47 F.3d at 52; Shields v. Citytrust Bancorp, Inc., 25 F.3d at 1128. Motive, we observed, could be shown by pointing to "the concrete benefits that could be realized" from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging "the means" used and the "likely prospect of achieving concrete benefits by the means alleged." Id. at 1130. This test is "generally met when corporate insiders [a]re alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." Novak, 216 F.3d at 308. But in attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are "possessed by virtually all corporate insiders," such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation. Id.; see, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996); Chill, 101 F.3d at 268; Acito v. IMCERA Group, Inc., 47 F.3d at 54.

This Court has also long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth. See, e.g., Lanza v. Drexel & Co., 479 F.2d 1277, 1301 (2d

- 22 -

Cir. 1973) (en banc); <u>Rolf v. Blyth, Eastman Dillon & Co.</u>, 570 F.2d 38, 47 (2d Cir.) ("<u>Rolf</u>"), <u>cert. denied</u>, 439 U.S. 1039 (1978); <u>SEC v. McNulty</u>, 137 F.3d 732, 741 (2d Cir.), <u>cert. denied</u>, 525 U.S. 931 (1998); <u>Novak</u>, 216 F.3d at 306, 308; <u>ATSI Communications, Inc. v. Shaar Fund Ltd.</u>, 493 F.3d 87, 99 n.3 (2d Cir. 2007). <u>See also</u> <u>Tellabs</u>, 551 U.S. at 319 n.3 ("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement" for civil liability under § 10(b) and Rule 10b-5 "by showing that the defendant acted [either] intentionally or recklessly"; the Supreme Court itself has not yet decided "whether [a showing of] reckless behavior is sufficient.").

By reckless disregard for the truth, we mean "conscious recklessness--i.e., a state of mind <u>approximating actual intent</u>, and <u>not merely a heightened form of negligence</u>," <u>Novak</u>, 216 F.3d at 312 (internal quotation marks omitted) (emphases ours). In elaborating as to what may constitute recklessness in the context of a private securities fraud action, we have referred to conduct that "'at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that <u>the danger was either known to the defendant or so obvious that the defendant must have been aware of it</u>,'" <u>In re Carter-Wallace, Inc. Securities Litigation</u>, 220 F.3d 36, 39 (2d Cir. 2000) (quoting <u>Rolf</u>, 570 F.2d at 47 (emphasis ours)); or to evidence that the "defendants failed to review or check <u>information that they had a duty to monitor</u>, or ignored

obvious signs of fraud," and hence "should have known that they were misrepresenting material facts," Novak, 216 F.3d at 308 (emphases added). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Chill, 101 F.3d at 269 (internal quotation marks omitted) (emphases added); see, e.g., SEC v. McNulty, 137 F.3d at 741 (defendant corporate officer who prepared and proceeded to file documents with the SEC containing statements whose veracity he himself had questioned, had had an obvious duty to verify the suspicious information).

In passing the PSLRA, Congress adopted a substantive "'standard modeled upon the pleading standard of the Second Circuit,'" Novak, 216 F.3d at 311 (quoting legislative history), insofar as we had applied a "strong inference" test (see Part II.B.2. below), although it did not adopt our motive-and-opportunity gloss for the pleading of intent or our alternative standard of recklessness, see Novak, 216 F.3d at 311. Thus, we reasoned that, under the PSLRA, litigants and courts need not "and should not employ or rely on magic words such as 'motive and opportunity'" with respect to intent; but that, in accordance with our prior cases, a strong inference of the requisite state of mind

> may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor . . . .

Id.; see also id. at 307-09.

In Novak, we also noted that "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others." Id. at 309. In Chill, for example, we held that the allegation that a parent company had failed to interpret its subsidiary's "unprecedented and dramatically increasing profitability" in a particular form of trading as a sign of problems, and thus had failed to investigate further, did not adequately plead recklessness amounting to scienter. See 101 F.3d at 269-70. In Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982), we held that the allegation of a non-fiduciary accountant's failure to identify problems in a company's internal controls and accounting practices was not sufficient. For "recklessness on the part of a non-fiduciary accountant [to] satisfy Ernst & Ernst's requirement of scienter," it must "approximate an actual intent to aid in the fraud being perpetrated by the audited company." Id.

2. PSLRA Pleading Requirements

As a general matter, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) ("Twombly") (emphasis ours)); see also Iqbal, 129 S. Ct. at 1953 ("the [Twombly] pleading standard [applies to] all civil actions" (internal quotation marks omitted)). "Determining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950. Generally "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949; see Twombly, 550 U.S. at 556.

In a private securities fraud action, however, "[u]nder the PSLRA's heightened pleading instructions," enacted in 1995 "[a]s a check against abusive litigation by private parties," Tellabs, 551 U.S. at 313, 321, the plaintiff must do more. See, e.g., Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) ("Teamsters Local 445"). Section 21D(b)(2) of the PSLRA, codified at 15 U.S.C. § 78u-4(b)(2), provides that

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (emphases added). To meet the "strong inference" standard, it is not sufficient to set out "facts from which, if true, a reasonable person could infer that the defendant acted with the required intent," for that gauge "does not capture the stricter demand Congress sought to convey in § 21D(b)(2)." Tellabs, 551 U.S. at 314 (internal quotation marks omitted) (emphasis ours). Rather, "[t]o qualify as 'strong' within the

intendment of § 21D(b)(2), . . . <u>an inference of scienter</u> must be more than merely plausible or reasonable--it <u>must be cogent and at least as compelling as any opposing inference of nonfraudulent intent</u>." <u>Tellabs</u>, 551 U.S. at 314 (emphases added). Thus,

> to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; <u>it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged</u>. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

<u>Tellabs</u>, 551 U.S. at 314 (emphases added).

In sum, "[a] plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter <u>at least as likely as</u> any plausible opposing inference." <u>Tellabs</u>, 551 U.S. at 328 (emphasis in original). And in determining whether this standard has been met, the court must consider whether "<u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Id</u>. at 323 (emphasis in original).

Applying these principles in <u>Teamsters Local 445</u>, in which the complaint alleged that false and misleading statements were made recklessly but did not allege that the defendants had any compelling motive to mislead their bondholders, we concluded that there were a number of permissible competing inferences, including an inference that the statements "were the result of merely careless mistakes" by the defendants "based on false information

fed" to them by others. 531 F.3d at 197 (internal quotation marks omitted). Given that this inference was "'at least as compelling'" as the conscious-recklessness inference advocated by the plaintiff, we concluded that the PSLRA required dismissal of the complaint. Id.

3. The Present Case

Within the above legal framework, South Cherry's challenge to the dismissal of its securities fraud claims presents two overarching questions: (1) whether the Complaint alleged facts sufficient to create a strong inference of scienter, and (2) whether an inference of scienter is at least as compelling as any opposing inference of nonfraudulent and nonreckless intent. To warrant reversal, both questions need to be answered in the affirmative. We conclude that both must be answered in the negative.

The district court viewed South Cherry's Complaint as asserting that Hennessee Group's conduct was reckless in recommending Bayou Accredited for investment. South Cherry, in challenging that decision, reiterates some of the allegations in the Complaint that led the court to that interpretation. (See, e.g., South Cherry brief on appeal at 25 ("South Cherry clearly alleged that HG failed to do basic due diligence, with the result that its 'representations and opinions were given without basis and in reckless disregard of their truth or falsity' as to the suitability of Bayou Accredited as an investment for South

Cherry." (quoting Rolf, 570 F.2d at 48)).) But South Cherry also argues that

> [its] allegation is that HG, perpetrating its own fraud (and not merely advancing Bayou's), made _intentional_ misrepresentations of fact to South Cherry when it represented, among other things, _the performance history_, _investment strategy_, _principals' track record_ and _auditors' identity for Bayou Accredited and its predecessor fund_ on the basis of thorough due diligence HG claimed to have performed, but did not.

(South Cherry brief on appeal at 20 (emphases added).) This somewhat convoluted sentence is perhaps subject to various interpretations; but we conclude that whichever way it was intended, the Complaint lacks sufficient factual allegations to give rise to a strong inference of either fraudulent intent or conscious recklessness.

To the extent that the quoted passage was intended to argue that Hennessee Group made "intentional" misrepresentations as to the performance and record of the Bayou funds and their principals, it does not carry the day because we see no such factual allegations in the Complaint. Despite the Complaint's conclusory allegation that Hennessee Group "_knowingly or recklessly (a) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (b) engaged in acts, practices, and/or a course of business that operated or would operate as a fraud or deceit upon South Cherry_" (Complaint ¶ 55 (emphasis added)), nowhere in the Complaint is there any allegation that Hennessee

- 29 -

Group had knowledge that any representation it made as to the records or circumstances of Bayou Accredited, or its predecessor Bayou Fund, was untrue. Instead, the Complaint is replete with allegations that HG "would" have learned the truth as to those aspects of the Bayou funds if HG had performed the "due diligence" it promised. (E.g., Complaint ¶¶ 7, 18, 26, 27, 28, 30.)

Nor, to the extent that South Cherry sought to allege recklessness, does the Complaint contain an allegation of any fact relating to Bayou Accredited that (a) was known to Hennessee Group and (b) created a strong inference that HG had a state of mind approximating an actual intent either to relay false or misleading information about Bayou Accredited or to aid in the fraud being perpetrated by the Bayou Accredited principals. Although the Complaint alleged that, "[i]n breach of its agreement with South Cherry," Hennessee Group "failed to take obvious investigative steps and ignored clear red flags" (id. ¶ 30), it did not allege that Hennessee Group did not believe that the various Bayou funds' representations, including their records and financial statements, were accurate. It did not allege any fact known to Hennessee Group prior to the summer of 2005, i.e., during the period in which HG was recommending Bayou Accredited, that either made the falsity of any of the Bayou funds' representations obvious or that should have alerted HG that the Bayou funds' representations were dubious. According to the Complaint, federal and state officials did not focus on the Bayou funds until the summer of 2005, following Israel's announcement to investors that the funds would

- 30 -

be liquidated. (See Complaint ¶¶ 36, 37.) There is no factual allegation in the Complaint that, prior to that announcement in July 2005, there were obvious signs of fraud, or that the danger of fraud was so obvious that HG must have been aware of it. Rather, the Complaint alleged that "[i]f" Hennessee Group had asked various questions earlier, it would have further questioned the Bayou Accredited financial records or recognized the need to ask further questions. (Complaint ¶¶ 18, 24; see also id. ¶¶ 7, 26, 27, 28, 30, 35.)

The closest the Complaint came to identifying any fact that supposedly should have put HG on fraud alert was the allegation that Bayou Accredited's purported auditor was named "Richmond Fairfield," because "Richmond [and] Fairfield [are] names that a diligent investigator might have recognized as names of counties and not accountants" (id. ¶ 27). But even leaving aside the Complaint's flawed premise, inter alia, that no person would have the same name as a place, the Complaint did not in fact allege that HG knew the Bayou funds' financials were purportedly audited by Richmond Fairfield; rather, it alleged that "[i]f" HG had taken "steps to 'verify' Bayou's auditors, as it promised South Cherry," HG "would . . . have discovered the existence of Richmond-Fairfield." (Complaint ¶ 24 (emphasis added).)

To the extent that the above-quoted passage from page 20 of South Cherry's brief was meant to argue that HG intended to defraud South Cherry as to HG's own performance, i.e., that HG represented that it had performed due diligence when in fact it

- 31 -

had not done so, the factual allegations in the Complaint do not give rise to a strong inference that the alleged failure to conduct due diligence was indicative of an intent to defraud. The only fact cited--in South Cherry's brief on appeal--as to a possible motive for such an intent is that HG receives a fee when a client invests in a recommended fund, and South Cherry suggests that HG wanted to receive its fee without incurring the expense of performing the promised due diligence (see South Cherry brief on appeal at 22, 23). This is hardly a cogent or compelling suggestion. According to the Complaint, Hennessee Group proclaimed itself the industry leader, boasted that its principals testify before Congress, repeatedly emphasized the thoroughness of its hedge fund evaluations, and prided itself on its credibility with investors and other participants in the hedge fund industry. (See, e.g., Complaint ¶¶ 13, 14.) The Complaint also alleged that HG represented that it evaluated 550 hedge funds each month (see id. ¶ 13), a representation that South Cherry does not claim was false, and alleged that HG recommended the Bayou Family Funds to a large number of investors who proceeded to invest tens of millions of dollars in those funds (see id. ¶ 10). Given the disclosures after the summer of 2005 as to the Bayou Family Funds principals' fraudulent conduct, it would be plausible to infer that Hennessee Group had been negligent in failing to discover the truth. It is far less plausible to infer that an industry leader that prides itself on having expertise that is called on by Congress, that emphasizes its thorough due diligence process, that values and

advertises its credibility in the industry--and that evaluates 550 funds--would deliberately jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made, according to South Cherry, little or no inquiry at all.

On appeal, South Cherry suggests that the combination of Hennessee Group's "wide recommendation of Bayou-related funds" and "its apparent failure to conduct much or any of the requisite due diligence or to learn easily discovered facts . . . lends itself to the inference" that HG was "receiving some undisclosed payment from the Bayou funds for steering additional investors toward them." (South Cherry brief on appeal at 23-24 & n.7.) This suggestion that Hennessee Group may have deliberately engaged in illegal behavior, see 15 U.S.C. § 77q(b) (requiring disclosure of existence and amount of payments made for promotion of securities), appears nowhere in the complaint, and South Cherry essentially concedes that this proffered inference is speculative. It argues that because such facts would be peculiarly within the knowledge of the defendants, it had no obligation to include such an allegation in the Complaint (see South Cherry brief on appeal at 23 n.7), intimating that it might hope to develop some such evidence in discovery. To be sure, South Cherry should not include such an allegation in its pleading without having a "factual basis or justification," Fed. R. Civ. P. 11 Advisory Committee Note (1993). But "before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct,"

- 33 -

_Twombly_, 550 U.S. at 564 n.8; and a plaintiff whose "complaint is deficient under Rule 8 . . . is not entitled to discovery," _Iqbal_, 129 S. Ct. at 1954. South Cherry's confessed inability to offer more than speculation that there may have been such unlawful conduct underscores, rather than cures, the deficiency in the Complaint.

The prior decisions of this Court on which South Cherry principally relies--_Novak_ and _Rolf_ (_see_ South Cherry brief on appeal, passim)--do not require a conclusion that the requisite state of mind has been adequately pleaded here, for they dealt with duties and actions different from those alleged here. _Novak_ dealt with shareholder claims against one group of company officials who allegedly issued fraudulently inflated financial statements and another group of defendants who owned a dominant percentage of the company's shares, a significant number of which they sold during the period in which the financials were inflated. The relationship between South Cherry and Hennessee Group, a consultant, does not parallel either of the relationships that existed in _Novak_; and indeed, in our _Novak_ opinion, the only claims at issue were those against the company officials who issued the financial statements. _See_ 216 F.3d at 305.

Nor does _Rolf_ provide support for South Cherry's claim that dismissal of its complaint pursuant to Rule 12(b)(6) was error, for _Rolf_ is significantly different from this case both procedurally and substantively. Our opinion in _Rolf_ reviewed a decision after trial; thus, we were dealing with actual evidence

and findings of fact, not assessing the adequacy of a pleading or the plausibility of inferences that could be drawn from factual allegations. And the pertinent facts, as sufficiently established at the Rolf trial, were that the defendants, a brokerage house and two of its account managers, had a fiduciary relationship with the plaintiff; that one of the individual defendants had engaged in fraudulent stock manipulations; and that the other individual defendant had aided and abetted the frauds on the plaintiff. Thus, the trial court concluded that the individuals and their firm had breached their fiduciary duty to the plaintiff. See 570 F.2d at 43, 47-48. Here, South Cherry has not sued the perpetrators of the Bayou funds' frauds, and the Complaint contains no allegation that Hennessee Group and its principals aided and abetted those frauds. Further, the present appeal involves no claim that Hennessee Group or its principals owed South Cherry a fiduciary duty. The Complaint contained a claim for breach of such a duty; but the district court dismissed that claim, and South Cherry has not pursued that claim on appeal.

In sum, we conclude (a) that the factual allegations in the Complaint do not give rise to a strong inference of either fraudulent intent or conscious recklessness, and (b) that the inferences advocated by South Cherry are not as compelling as an inference of negligence. Accordingly, on either ground, South Cherry's efforts to plead a claim under § 10(b) and Rule 10b-5 were properly found wanting for lack of plausible and cogent allegations of scienter.

At bottom, this was a contract case. "The obligation to conduct the five-step due diligence [wa]s one imposed by contract on HG." (South Cherry brief on appeal at 27 (emphasis in original); see, e.g., id. at 21 (the "ongoing Ponzi scheme" would have been obvious if Hennessee Group had "conduct[ed] any substantial portion of the due diligence it promised" (emphasis added; other emphasis omitted)); id. at 29-30 (HG would have discovered the Bayou fraud "had it performed even a modicum of the due diligence for which South Cherry bargained" (emphasis added)).) But the alleged contract was not in writing and hence was unenforceable under the Statute of Frauds; and we cannot conclude, given the factual allegations of the Complaint, that these non-fiduciary defendants' failure to learn the truth constitutes the scienter needed to state a claim under § 10(b) and Rule 10b-5 where the supposed obligation to learn was imposed only by an agreement that is void.

CONCLUSION

We have considered all of South Cherry's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.

- 36 -