**Sarit TAMAR, Individually and On Behalf of All Others Similarly Situated, Plaintiff,**

v.

**MIND C.T.I., LTD., Monica Eisinger, Oren Bryan, and Zamir Bar–Zion, Defendants.**

**No. 09 Civ. 7132(RMB).**

United States District Court, S.D. New York.

July 2, 2010.

William Bernard Federman, Federman & Sherwood, Oklahoma City, OK, for Plaintiff.

Aurora Cassirer, Troutman Sanders LLP, New York, NY, for Defendants.

### ORDER

RICHARD M. HERMAN, District Judge.

## I. Introduction

On November 23, 2009, Sarit Tamar ("Plaintiff") filed a First Amended Class Action Complaint ("Amended Complaint") against Mind C.T.I., Ltd. ("Mind"), Mind's President and Chief Executive Officer Monica Eisinger ("Eisinger"), Mind's Chief Financial Officer Oren Bryan ("Bryan"),

and Zamir Bar–Zion ("Bar–Zion"), a Mind director and member of Mind's audit committee (collectively, "Defendants"). (*See* Am. Compl. ¶¶ 1, 12–16.) Plaintiff asserted claims against Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), and as to Eisinger, Bryan, and Bar–Zion ("Individual Defendants"), Plaintiff asserted claims pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). (*See* Am. Compl. ¶¶ 215–23.) Plaintiff alleges, among other things, that from June 8, 2006 to February 27, 2008 ("Class Period"), "Defendants knowingly or recklessly concealed … [that] most of Mind's reported cash position was comprised of illiquid Auction Rate Securities ('ARSs')" and that "internal controls over the monitoring, accounting and reporting of the Company's investments in cash equivalents and/or short-term investments were materially deficient." (Am. Compl. ¶ 3.)

On January 21, 2010, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") arguing, among other things, that: (1) Plaintiff "fails to allege particularized facts giving rise to a 'strong inference' of scienter" because "the [Amended] Complaint does not supply even a scintilla of actual evidence to support the assertion that Defendants made false statements knowingly or recklessly"; and (2) Plaintiff's Section 20(a) claim fails because "Plaintiff has failed to allege an underlying violation of the federal securities laws by Defendants."

(Defs.' Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., dated Jan. 21, 2010 ("Mot."), at 12–24.) [1]

On March 1, 2010, Plaintiff submitted an opposition arguing, among other things, that: (1) "Defendants clearly had reasonable access to information that would have alerted them to the identity and nature of Mind's investment" in the ARSs that comprised most of Mind's reported cash position, *i.e.*, the Mantoloking CDO, Class A–2 ARSs ("Mantoloking ARSs"); and (2) Plaintiff has alleged primary violations of Section 10(b) and Rule 10b–5 against each of the Individual Defendants. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, dated Mar. 1, 2010 ("Opp'n"), at 14–25.) In addition, Plaintiff argues that "[s]hould the Court grant Defendants' Motion, Plaintiff should be given leave to amend." (Opp'n at 25.)

On March 26, 2010, Defendants submitted a reply. (Reply, dated Mar. 26, 2010 ("Reply").) Oral argument was held on June 28, 2010. (*See* Tr. of Proceedings, dated June 28, 2010("Hr'g Tr.").)

**For the reasons set forth below, Defendants' motion to dismiss is granted.**

## II. Background

For the purposes of this motion, the allegations of the Amended Complaint are taken as true. *See Almonte v. City of Long Beach,* 478 F.3d 100, 104 (2d Cir. 2007).

Defendant "Mind is an Israeli Corporation [that] purports to develop, and [to] manufacture and market real-time and offline and customer care software for vari-

---

1. Defendants further argue that Plaintiff's claim under Section 10(b) and Rule 10b–5 does not sufficiently state a claim because Plaintiff "fails to properly plead the elements of loss causation." (Mot. at 20; *see also* Opp'n at 21–24.) "As discussed in detail below, because the [C]ourt finds that [P]lain-

tiff[ ] ha[s] failed to plead scienter adequately, the [C]ourt need not consider the issues of loss causation …," *Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.,* No. 09 Civ. 3708, 2010 WL 1257567, at *5 (S.D.N.Y. Mar. 31, 2010); *see* pp. 554–59 & note 5, *infra.*

ous types of communication providers." (Am. Compl. ¶ 2.) Plaintiff Sarit Tamar "purchased Mind common stock through the NASDAQ stock exchange" in transactions between June 9, 2006 and January 23, 2008. (Am. Compl. ¶ 12; *see* Decl. of William B. Federman [# 9], dated Oct. 13, 2009 ("Federman Decl."), Ex. 1 (Plaintiff's Certification of Investment in Mind).) Plaintiff held 22,000 shares as of June 12, 2006; she sold 18,100 before November 6, 2007 and she purchased 19,900 shares after November 6, 2007.[2] (*See* Federman Decl. Ex. 1); *see* p. 552, *infra.* Plaintiff purports to bring a putative class action on behalf of persons who purchased or otherwise acquired Mind common stock through the NASDAQ stock exchange during the Class Period (June 8, 2006 to February 27, 2008). (*See* Am. Compl. ¶ 1.)

"Sometime in the fourth quarter of 2006, Mind purchased $22.8 million of the Mantoloking [ARSs]," (Am. Compl. ¶ 67), which have a maturity date of 2046. (*See* Am. Compl. ¶ 46.) It was possible for Mind to redeem its holdings in the Mantoloking ARSs before the date of maturity because, at the time of Mind's purchase of these securities, the issuer, Merrill Lynch, held a bidding process every 28 days by which holders of the Mantoloking ARSs could attempt to sell their investment. (*See* Am. Compl. ¶¶ 3049, 134.)

"Prior to 2005, some companies classified ARSs as 'Cash and Cash Equivalents' while others classified them as 'Investments in Marketable Securities' (either short term or long term)." (Am. Compl. ¶ 28.) Plaintiff alleges that, as the April 25, 2005 issue of "CFO.com" recognized, in 2005 there was a "change in accounting [of ARSs] from 'Cash and Cash Equivalents'

to either short-term or long-term investments." (Am. Compl. ¶ 35.) According to "CFO.com," since December 2004 when Ernst & Young first began advising clients to make the change from classifying ARSs as cash or cash equivalents to classifying them as short or long term investments, "scores of CFOs have altered the[ir] accounting treatment for ARS[s]." (Am. Compl. ¶ 34.)

At the core of the Amended Complaint is Plaintiff's allegation that "Defendants failed to disclose that Mind's accounting practices, which were in violation of [Generally Accepted Accounting Principles ('GAAP')], resulted in classifying short-term investments in securities such as ARSs as 'cash' or 'cash equivalents.'" (Am. Compl. ¶ 56.) In particular, Plaintiff alleges:

- In a press release issued on February 21, 2007, Mind stated that "Financial Highlights of Q4 2006 [include a] [s]trong cash position of approximately $38 million as of December 31, 2006." (Am. Compl. ¶ 70.)

- Also on February 21, 2007, during an "earnings conference call with analysts, Bryan reported that Mind's 'cash position remains strong with approximately S37.6 million as of December 31, 2006.'" (Am. Compl. ¶ 72.)

- In a "press release filed on Form 6–K [on May 10, 2007] Eisinger reiterated: 'Regarding our cash position … it is strong with over $34 million.'" (Am. Compl. ¶ 79.)

- "On August 8, 2007, Defendants held a conference call with analysts" during which Bryan stated that "[Mind's] cash position remains strong with approxi-

**2.** (*See* Hr'g Tr. at 4:9–19) ("MS. CASSIRER: The [P]laintiff … bought 22,000 shares and sold [18,100] before there was any corrective announcement made [on November 6, 2007]. Thus, she basically got her money's worth.

She bought her stock when the allegedly deceptive statements were made and she sold it during that same period. After there was a corrective filing … she then went out and bought another 19, [9]00 shares….")

mately $35.5 million as of June 30, 2007." (Am. Compl. ¶¶ 104, 106); see pp. 557–59, infra.

It is Plaintiff's contention that these statements were false and misleading because Mind was invested "in highly illiquid ARSs" that "involve[d] a high degree of risk" and that the Mantoloking ARSs did not qualify as cash equivalents. (Am. Compl. ¶¶ 49, 52, 69.)

Plaintiff also alleges that Defendants knew or should have known of the high risk and illiquid nature of the Mantoloking ARSs based upon two documents that were publicly available, i.e., an "Offering Circular for the Mantoloking ARS[s]" that advised investors that these securities "involve a high degree of risk" and have "limited liquidity," (Am. Compl. ¶ 49), and an advisory issued by PriceWaterhouseCoopers ("PwC") entitled "Advisory 3005–04, Investors' Classification of Auction Rate Securities" ("PwC Advisory") that contained the "[o]bservation" that "[t]he proper classification of auction rate securities should be based on the contractual maturity of the security, and not the next reset date." (Am. Compl. ¶ 163); see pp. 556–59, infra.

Plaintiff further alleges that, on November 6, 2007, Defendants filed on Form 6–K its earnings release which "finally shed some light," (Am. Compl. ¶ 124), on Mind's investment in Mantoloking ARSs by making the following disclosure:

Accounting Treatment of Auction Rate Securities

On November 5, 2007, the Board of Directors, after discussion with the Company's independent registered public accounting firm, concluded that the balance sheets and statements of cash flows included in the Company's form 20–F for the fiscal year ended December 31, 2006 should be amended in order to correct the classification of auction rate securities on the balance sheet and in the statements of cash flows of the Company.... [G]iven that ... auction rate securities have long-term stated maturities and that the issuers of such auction rate securities are under no obligation to redeem them prior to their stated maturities, the Company has determined that its investments in such securities consisting of $22.8 million as of December 31, 2006, should have been classified as short-term investments, rather than as cash equivalents.

(Am. Compl. ¶ 124.) "On December 6, 2007, Defendants filed a 2006 20–F*A, A, which restated Mind's financial statements for the year ending December 31, 2006 by classifying '$22.8 million of previously reported cash and cash equivalents' as 'short-term investments.'" (Am. Compl. ¶ 129.) In this disclosure, "Defendants also admitted that '[i]n connection with [the] restatement, management determined that a material weakness in internal control over financial reporting existed as of December 31, 2006 because at that time we did not have effective controls designed and in place to ensure that our investments were classified in accordance with ... GAAP.'" (Am. Compl. ¶ 4.)

On February 20, 2008, Mind filed a Statement of Claim with the Financial Industry Regulatory Authority against Credit Suisse, its investment bank, and certain Credit Suisse employees ("FINRA Arbitration") alleging, among other things, "that the bank was supposed to invest [Mind's] funds in highly liquid, highly safe, 28–day auction rate securities, but-without [Mind's] authorization invested the funds ... in a security called 'Mantoloking [ARSs].'" (Am. Compl. ¶ 134 (quoting Press Release, Mind, Mind CTI Announces Q4 2007 Preliminary Unaudited Operating Results (Feb. 27, 2008)).) Mind sought recovery in the FINRA Arbitration of $22.8 million, i.e., presumably the

amount it had invested in the Mantoloking ARSs. (*See* Am. Compl. ¶¶ 67, 124.) In the third quarter of 2009, Mind obtained S18.5 million cash from Credit Suisse in settlement of its Statement of Claim. (*See* Form 6–K, dated Sept. 9, 2009; *see also* Opp'n at 5.) Based upon this settlement, Mind's Board of Directors "authorized ... the distribution of a cash dividend in the amount of $0.80 per share, or approximately $15 million in the aggregate." (Form 6–K, dated Sept. 9, 2009.)

Mind was also identified as "a victim of two Credit Suisse bankers who purported to manage [Mind's] cash holdings." (Opp'n at 6 (citing *United States v. Butler*, No. 08 Cr. 370 (E.D.N.Y. filed June 3, 2008) ("*U.S. v. Butler*")).) The two bankers, Julian Tzolov ("Tzolov") and Eric Butler ("Butler"), were indicted for, among other things, securities and wire fraud under 15 U.S.C. §§ 78j(b) & 78ff and 18 U.S.C §§ 2, 371, 1343, 1349 & 3551 *et seq.* It was alleged that:

> Julian Tzolov and Eric Butler explained to [certain] [c]ompanies that [student-loan-ARSs] [ ("SL–ARSs") ] were low risk products, guaranteed by the United States government [and that] the market for SL–ARSs was very liquid because of the federal government guarantee.... [W]ithout the knowledge of or consent of the [c]ompanies, instead of using the proceeds of auction from the sale of ... SL–ARSs to purchase new SL–ARSs, the defendants Julian Tzolov and Eric Butler used the proceeds of auctions from the sale of ... SL–ARSs to purchase other types of ARSs, including higher-yield, mortgage backed CDO–ARSs. As part of their fraudulent scheme, and to conceal the true nature of their conduct, the defendants Julian Tzolov and Eric Butler sent to the [c]ompanies electronic mail communications in which Tzolov and Butler, or others working at their direction, falsified the names of the products held by

> the [c]ompanies to make it appear that those products were the ... SL–ARSs when they were, in fact, other types of ARSs, including the ... CDO–ARSs. Tzolov and Butler did so either by removing the term "CDO" from the name of the product, by adding the term "student loan" or "SL," or by doing both.

*U.S. v. Butler* Superseding Indictment [# 1], dated Aug 26, 2008, ¶¶ 11, 14, 15. On July 21, 2009, Tzolov pleaded guilty to conspiracy, wire fraud, and securities fraud in violation of 18 U.S.C. §§ 2 & 1343 and is awaiting sentencing. *See U.S. v. Butler* Affidavit/Affirmation by United States as to Tzolov [# 197], dated July 21, 2009. On August 17, 2009, Butler was convicted of conspiracy to commit securities fraud, securities fraud, and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 & 1349 and 15 U.S.C. §§ 78j(b) & 78ff and was sentenced to five years in prison. *See U.S. v. Butler* Jury Verdict [# 248], dated Aug. 17, 2009, at 2; *see also U.S. v. Butler* Judgment [# 363], dated Feb. 9, 2010.

### III. Legal Standard

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *S. Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). The plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949).

"A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires fraud to be alleged with particularity." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001).

■ "To state a claim under § 10(b) and the corresponding Rule 10b–5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d Cir.2000). A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see Novak,* 216 F.3d at 310. "[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) [of the Private Securities Litigation Reform Act of 1995 ('PSLRA'), Pub.L. No. 104–67, 109 Stat. 737,] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, ... but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *S. Cherry,* 573 F.3d at 111 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 196 (2d Cir.2008) (quoting *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000)). And, "[e]ven an egregious failure to gather information will not establish 10b–5 liability so long as the defendants did not deliberately shut their eyes to the facts." *In re Bayou Hedge Fund Litig.,* 534 F.Supp.2d 405, 415 (S.D.N.Y.2007) (citation omitted), *aff'd sub nom. S. Cherry,* 573 F.3d at 98.

■ Leave to amend is appropriately denied where the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies. *See Kelter v. Apex Equity Options Fund, LP,* No. 08 Civ. 2911, 2009 WL 2599607, at *10 (S.D.N.Y. Aug. 24, 2009).

■ When a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC. *See Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991). And, "docket sheets are public records of which the court c[an] take judicial notice." *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006).

## IV. Analysis

### (1) Scienter

■ A plaintiff may establish a strong inference of scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007).

**Motive and Opportunity**

Defendants argue, among other things, that "[t]he sole motive ascribed for the alleged fraud is the universal corporate desire to 'attract customers, finance current operations, and [to] pursue strategic acquisitions,' a patently inadequate allegation." (Mot. at 1 (quoting Am. Compl. ¶ 5).) Plaintiff does not appear to respond to this argument in its Opposition but did state at oral argument that "the CEO [*i.e.,* Eisinger] owned 19 percent of the stock. Without the dividend she would not get 19 percent of the dividend payment. It was a huge payment to her." (Hr'g Tr, at 5:14–17; *see also* Ltr. from William B. Federman to Hon. Richard M. Berman, dated

June 30, 2010.) Presumably, according to Plaintiff, that was her motive.

■ "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit,* 264 F.3d at 139; *see In re Rhodia S.A. Sec. Litig.,* 531 F.Supp.2d 527, 548 (S.D.N.Y.2007) ("The complaint must allege more than 'a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor.'") (quoting *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir.1996)); *In re Emex Corp. Sec. Litig.,* No. 01 Civ. 4886, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002).

■ The motives ascribed by Plaintiff to Defendants to "attract customers, finance current operations, and [to] pursue strategic acquisitions," (Am. Compl. ¶ 5), have been routinely rejected by courts within the Second Circuit as insufficient to establish scienter. *See Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230, 2004 WL 1124660, at *3 (S.D.N.Y. May 20, 2004) ("Simply alleging that defendants sought to artificially raise stock prices ... to attract new clients without any specific allegations, does not 'entail concrete benefits' and therefore fails to allege improper motive sufficient to meet the pleading standards of Rule 9(b)." (quoting *Chill,* 101 F.3d at 268)); *In re Elan Corp. Sec. Litig.,* 543 F.Supp.2d 187, 216 (S.D.N.Y.2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product.... These allegations do not support an inference of scienter."); *Defer LP v. Raymond*

*James Fin., Inc.,* 654 F.Supp.2d 204, 217 (S.D.N.Y.2009) ("An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient."); *Kalnit,* 264 F.3d at 141 ("[T]he desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired. Such generalized desires do not establish scienter."); *In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d 510, 531–32 (S.D.N.Y.2009); *In re JP Morgan Chase Sec. Litig.,* 363 F.Supp.2d 595, 620 (S.D.N.Y.2005) ("The unstated presumption that Chase began defrauding its own shareholders in contemplation of entering into merger talks is too nebulous to raise a strong inference of scienter.").

■ And, Plaintiff's contention at oral argument that scienter can be inferred because "19 percent of the dividend payment ... was a huge payment to [Eisinger]," (Hr'g Tr. at 5:14–17), is rejected because this argument is not made in any of Plaintiff's papers.[3] *See Faber v. Metro. Life Ins. Co.,* No. 08 Civ. 10588, 2009 WL 3415369, at *7 (S.D.N.Y. Oct. 23, 2009). "[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion." *In re Monster Worldwide, Inc. Sec. Litig.,* 251 F.R.D. 132, 137 (S.D.N.Y.2008); *see also Halpert Enter., Inc. v. Harrison,* No. 07–1144–cv, —— Fed.Appx. ——, —— n. 1, 2008 WL 4585466, at *3 n. 1 (2d Cir. Oct.15, 2008) ("given Halpert's failure to mention this argument in either its complaint or its memorandum, raising any such claim even explicitly at oral argument would have been to no avail"); *Design Strategy, Inc. v. Davis,* 469 F.3d 284, 300 (2d Cir.2006);

---

3. Plaintiff appears to recognize after the fact that its Amended Complaint does not allege that any Defendant received personal financial gain from the alleged fraud. (*See* Opp'n at 17 n. 8) (while "personal financial gain

may weigh heavily in favor of a scienter inference ... the absence of a motive is not fatal." (quoting *Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499).)

*Moody v. Morris,* 608 F.Supp.2d 575, 580 n. 1 (S.D.N.Y.2009).

██ Even assuming, *arguendo,* that Plaintiff had raised this argument in its Amended Complaint or its Opposition (which it did not do), "the bare allegation of a shareholder's incentive to maximize the corporation's stock price is insufficient to satisfy the scienter element of a securities fraud claim." *In re Yukos Oil Co. Sec. Litig.,* No. 04 Civ. 5243, 2006 WL 3026024, at *19 (S.D.N.Y. Oct. 25, 2006) (alleged "motive to fraudulently inflate Yukos' stock price in order to obtain larger dividends from the Company" is insufficient to establish scienter); *see also Rombach v. Chang,* 355 F.3d 164, 177 (2d Cir.2004); *Kalnit,* 264 F.3d at 139–40; *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir. 1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994). "Because this incentive is common to all shareholders, it lacks the requisite 'concrete and personal' nexus to the individual alleged to have made the misstatement or omission." *In re Yukos Oil Co. Sec. Litig.,* 2006 WL 3026024, at *19 (quoting *Novak,* 216 F.3d at 307–08); (*see also* Hr'g Tr. at 8:23–9:1 ("MS. CASSIRER: [I]t strains credulity to think that [Eisinger, the owner of] 20 percent of [Mind's] stock [,] is going to take the insane or reckless risks that [Plaintiff] is describing merely to get dividends."),)

██ Plaintiff fails to "show an individualized desire to benefit from the fraudulently elevated stock price, above and beyond the passive accretion of one's equity holdings." *In re Yukos Oil Co. Sec. Litig.,* 2006 WL 3026024, at *19. For example, while Plaintiff alleges that, "[a]s of June 1, 2007, Eisinger held 4.1 million shares of Mind or 19% of [Mind's] issued and outstanding stock," it does not allege that Eisinger sold any of these shares during or after the Class Period and does not allege that Bryan or Bar–Zion owned any

Mind securities. (*See* Am. Compl. ¶¶ 15–16.) "Absent some allegation to explain how a defendant benefits from an inflated stock price, stock ownership does not provide sufficient motive to sustain the pleading burden under Rule 9(b)." *Shields,* 25 F.3d at 1131; *see also Goplen v. 51job, Inc.,* 453 F.Supp.2d 759, 772 (S.D.N.Y. 2006) ("But plaintiffs do not allege that the individual defendants actually sold any stock during the Class Period."); *In re Yukos Oil Co. Sec. Litig.,* 2006 WL 3026024, at *19 ("The Complaint alleges merely the passive maintenance of stock positions and the receipt of dividends in due course, not 'unusual insider trading activity during the [C]lass [P]eriod.'") (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999)).

**No Conscious Misbehavior or Recklessness**

Defendants argue, among other things, that "Plaintiff does not sufficiently allege that Defendants made the relevant statements with 'contemporaneous knowledge' that its investment bank had misled it as to the nature of its investments or that it could anticipate the meltdown of the ARS market; nor does Plaintiff plead specific facts demonstrating that Defendants were acting in a way that 'easily can be foreseen to result in harm.'" (Mot. at 17 (citation omitted).) Plaintiff counters, among other things, that it "belies belief that no one in senior management ... ever looked at the [O]ffering [C]ircular" for the Mantoloking ARSs and Defendants "[o]bviously ... knew at least by November 5, 2007 after the auctions failed" that Mind's financial disclosures should be amended. (Opp'n at 19–20.)

██ "To prove intent based on a theory other than motive-and-opportunity, a securities fraud plaintiff must allege facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Bay Harbour Mgmt. LLC v. Carothers*, 282 Fed.Appx. 71, 77 (2d Cir. 2008) (citation omitted). "Recklessness is defined as 'at the least, ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.2009) (quoting *Novak*, 216 F.3d at 308). "Where motive is not apparent, ... the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

■ "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309.

■ As to Plaintiff's allegations that Defendants made statements inconsistent with the information contained in the Offering Circular for the Mantoloking ARSs, Plaintiff fails to allege facts that particularize how and why each defendant actually knew, or was reckless in not knowing, that the alleged statements and omissions were fraudulent at the time they were made. (*See, e.g.,* Am. Compl. ¶¶ 49 ("[t]he Offering Circular specifically contained risk warnings"); 69); *see also Defer LP*, 654 F.Supp.2d at 217 (S.D.N.Y.2009); *see Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F.Supp.2d 287, 298–99 (S.D.N.Y.2010). For example, Plaintiff merely alleges that there existed at some unspecified time a "Mantoloking CDO Offering Circular" and does not allege that any of the Defendants ever read, possessed, or were aware of the Offering Circular. *See In re GeoPharma, Inc. Sec. Litig.*, 399 F.Supp.2d 432, 452 (S.D.N.Y. 2005) ("Plaintiffs have cited no case, and I am aware of none, where a plaintiff adequately pled scienter based solely on the contradiction between **public** information and the company's public statements." (emphasis in original)); *In re Bayou Hedge Fund Litig.*, 534 F.Supp.2d at 415 ("[e]ven an egregious failure to gather information will not establish 10b–5 liability so long as the defendants did not deliberately shut their eyes to the facts"); *see also 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F.Supp.2d 199, 227 (S.D.N.Y. 2008) ("There is simply no allegation that [defendant] was confronted with any of the 'red flags' that are required to support a strong inference of reckless disregard."). This failure to link any particular Defendant with the factual background from which Plaintiff alleges all Defendants' scienter can be inferred contravenes Rule 9(b). *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, No. 88 Civ. 1543, 1989 WL 31676, at *4 (S.D.N.Y. Mar. 30, 1989).

■ Plaintiff's allegations that "obviously" Defendants knew at least by November 5, 2007 that Mind's investment in the Mantoloking ARSs should have been classified as investments do not support a strong inference of scienter because Mind disclosed that fact in a press release issued the next day, *i.e.,* November 6, 2007. (*See* Am. Compl. ¶ 124) ("On November 6, 2007, Defendants filed a Form 6–K" which stated that Mind's "investments in [auction rate] securities consisting of $22.8 million as of December 31, 2006, should have been classified as short-term investments, rather than as cash equivalents."); *see Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir.2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled

to investigate for a reasonable time, until they have a full story to reveal."). To the contrary, "[l]ater disclosures that timely raised questions about the reliability of financial information ... lend weight to an inference that contemporaneous financial statements were made in good faith." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir.2010) (quoting *Matrix Capital Mgm't Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187 (4th Cir.2009)).[4]

The Court further finds that a reasonable person would not deem Plaintiff's purported inference of scienter under the "conscious misbehavior or recklessness" prong to be "at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re PXRE Group, Ltd., Sec. Litig.*, 600 F.Supp.2d at 548 (quoting *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499); *see Plumbers & Steamfitters Local 773 Pension Fund*, 694 F.Supp.2d at 301 ("Under the *Tellabs* 'comparative' inquiry, the inference [p]laintiff asks this Court to draw from [defendants'] statements must be considered against 'cogent' and 'compelling' alternative explanations for a deficiency." (citing *Tellabs*, 551 U.S. at 323–24, 127 S.Ct. 2499)). Defendants contend that "Mind, rather than acting with scienter, was itself defrauded by its investment bankers into believing its investment was a safe, liquid alternative to bank deposits." (Mot. at 7.) Indeed, the Amended Complaint supports Defendants' contention by referencing a Statement of Claim filed by Mind on February 28, 2008 against Credit Suisse and certain of its employees alleging "that the bank was supposed to invest the funds in highly liquid, highly safe, 28–day auction rate securities, but—without the Company's authorization—invested the funds ... in a security called 'Mantoloking CDO,'" (Am. Compl. ¶ 134.) Not only do Plaintiff's allegations support Defendants' contention, but its Amended Complaint does not offer any factual explanation in contradiction of this contention. *See Hammerstone NV, Inc. v. Hoffman*, No. 09 Civ. 2685, 2010 WL 882887, at *10 (S.D.N.Y. Mar. 10, 2010) ("Plaintiffs' allegations simply do not contradict the factual explanation of events [p]laintiffs themselves pointed to in ... public disclosures."); (*see* Form 6–K, dated Sept. 9, 2009 ("[I]n the third quarter of 2009, [Mind received an] $18.5 million cash settlement of [its] arbitration claim related to its auction rate securit[ies].")); *U.S. v. Butler* Superseding Indictment [# 1], dated Aug. 26, 2008, ¶ 15 ("[T]o conceal the true nature of their conduct, the defendants Julian Tzolov and Eric Butler sent to the [c]ompanies electronic mail communications in which Tzolov and Butler, or others working at their direction, falsified the names of the products held by the [c]ompanies to make it appear that those products were the ... SL–ARSs when they were, in fact, other types of ARSs, including the ... CDO–ARSs. Tzolov and Butler did so either by removing the term 'CDO' from the name of the product, by

---

4. Plaintiff's contention at oral argument that this Court's recent decision, *SRM Global Fund L.P. v. Countrywide Fin. Corp.*, No. 09 Civ. 5064, 2010 WL 2473595, at *10 (S.D.N.Y. June 17, 2010), supports her claim is not persuasive. (*See* Hr'g Tr. at 6:9–11.) The cases are distinguishable. Here, for example, "Plaintiff[] should, but do[es] not, provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F.Supp.2d at 299 (S.D.N.Y.2010); *see Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir.2000) ("Although the [a]ppellants do not have to fix the exact date and time that [appellees] became aware that recovering royalty payments through future sales would be unlikely, they must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged." (citations omitted)); *see also SRM Global Fund*, 2010 WL 2473595, at *2.

adding the term 'student loan' or 'SL,' or by doing both."); *see also In re Sec. Capital Assurance Ltd. Sec. Litig.*, No. 07 Civ. 11086, 729 F.Supp.2d 569, 595–96, 2010 WL 1372688, at *26 (S.D.N.Y. Mar. 31, 2010) (no scienter where "[p]laintiffs' own allegations reveal that … [d]efendants were woefully unaware of the true risk presented by their investment in CDOs, and did not know the facts or have the information necessary to know that their statements might be inaccurate"). Accordingly, Plaintiff has not raised a strong inference of scienter, *i.e.,* "an inference that is cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 Civ. 2594, 2010 WL 1779348, at *6 (S.D.N.Y. Apr. 28, 2010) (quoting *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499).[5]

#### (2) Section 20(a)

■■■ To establish a prima facie case of a violation under Section 20(a), a plaintiff must show "a primary violation by the controlled person and control of the primary violator by the targeted defendant and show that the controlling person was in some meaningful sense [a] culpable participant [ ] in the fraud perpetrated by [the] controlled person [ ]." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996) (internal quotation marks omitted).

■■■ Defendants' motion to dismiss Plaintiff's Section 20(a) claims is granted because Plaintiff has failed to plead facts showing a primary violation of the securities laws by the allegedly controlled persons. *See In re Alstom SA*, 406 F.Supp.2d 433, 486 (S.D.N.Y.2005); *see* pp. 554–59, *supra*; *see also ATSI Commc'ns*, 493 F.3d at 108 ("ATSI fails to allege any primary

violation; thus, it cannot establish control person liability."); *Campo v. Sears Holdings Corp.*, 635 F.Supp.2d 323, 336 (S.D.N.Y.2009) ("As the Court concludes that the Complaint does not adequately allege that defendants made an actionable misstatement or material omission with scienter, the Court need not consider whether the Complaint adequately alleges … their Section 20(a) claims.").

#### Leave to Amend

■■■ Leave to amend is appropriately denied where, as here, the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies. *See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F.Supp.2d 282, 304 n. 27 (S.D.N.Y. 2000); *see Chill*, 101 F.3d at 271–72. At a conference with the Court on June 3, 2010—*i.e.*, over two months after Defendants' Motion was fully briefed—the Court inquired as to whether Plaintiff wished to amend her complaint in light of Defendants' Motion. (*See* Tr. of Proceedings, dated June 3, 2010, at 2:23–3:14.) Plaintiff responded that she did not. (*See id.* at 3:16–4:11 ("MR. FEDERMAN [counsel for Plaintiff]: This is the operative complaint, unless some new information comes out from the Defendant…. THE COURT: Okay. And you know what the Plaintiff's position is because you have seen the papers obviously. MS. CASSIRER [counsel for Defendants]: Yes, and I think the [Amended] [C]omplaint is insufficient, which is why I moved to dismiss it. THE COURT: I understand. But he is saying in response to your motion he feels the [Amended] [C]omplaint as set forth in his papers is sufficient and that the [M]otion would be dispositive, as it were, one way or another. He doesn't need to amend fur-

---

5. "Because it is unnecessary to do so, the Court does not reach [D]efendants' arguments concerning … loss causation." *In re Australia & New Zealand Banking Group Ltd. Sec.* *Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *7 n. 10 (S.D.N.Y. Dec. 14, 2009); *see* note 1, *supra*.

ther ... in response to your [M]otion. Is that a fair statement? MR. FEDERMAN: Yes, your Honor. That is a fair assessment.")); *see also In re Hyperion Sec. Litig.*, No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. Jul. 14, 1995) (denying leave to amend where plaintiffs had been given "more than two bites at an apple they have not been able to get their teeth into"), *aff'd*, 98 F.3d 2 (2d Cir.1996). "In light of [P]laintiff['s] failure to cure the defects after being provided notice, this is not a case where leave to amend should be given because 'justice so requires.'" *In re Eaton Vance Mut. Funds Fee Litig.*, 403 F.Supp.2d 310, 319 (S.D.N.Y.2005).

## V. Conclusion

For the reasons set forth above, Defendants' motion to dismiss [# 13] is granted. The Clerk of Court is respectfully requested to close this case.