Steve Gonick, individually, Plaintiff,

against
Adirondack Research & Management, Inc., GREGORY A. ROEDER, individually and MATTHEW P. REINER, individually, Defendants.


A456-14

Hinckley, Allen & Snyder, LLP
Attorneys for Plaintiff
(Michael L. Koenig and Victoria P. Lane, of counsel)
30 South Pearl Street, Suite 901
Albany, New York 12207
E. Stewart Jones Hacker Murphy
Attorneys for Defendants
(James E. Hacker and Thomas J. Higgs, of counsel)
28 Second Street
Troy, New York 12180


Richard M. Platkin, J.

Plaintiff Steve Gonick commenced this commercial action in June 2014 against defendants Adirondack Research & Management, Inc. ("ARMI"), Gregory A. Roeder and Matthew P. Reiner, alleging four causes of action: (1) declaratory judgment; (2) breach of contract; (3) breach of fiduciary duty; and (4) tortious interference with contract.[FN1]
In January [*2]2015, the Court granted defendants' motion to dismiss the latter two causes of action, and the parties proceeded to conduct discovery on the remaining claims. By Decision & Order dated March 16, 2016, the Court granted Gonick's motion to amend the complaint to add causes of action sounding in quasi contract and fraudulent misrepresentation. Pre-trial discovery now is complete, and defendants move pursuant to CPLR 3212 for summary judgment dismissing Gonick's amended complaint ("Complaint"). Gonick opposes the motion.
BACKGROUND
ARMI began operations in or about 2004 as an investment advisor to the Adirondack Small Cap Fund ("Fund"), a mutual fund established by non-party Adirondack Funds, an Ohio business trust. Defendant Roeder is the founder of ARMI and has served as a member of its board of directors, president and corporate secretary since it commenced investment operations. Defendant Reiner joined ARMI in 2005 and has served as a member of its board of directors, vice-president and corporate treasurer.
Gonick alleges in his Complaint that he was hired by ARMI in or about May 2009 "to head up [its] marketing, investor relations and branding" (¶ 9), and he claims to have served as "a Principal, executive vice president, and chief marketing officer" of the firm (¶ 11). In these capacities, Gonick allegedly "oversaw most of [ARMI's] operations outside of research and portfolio management, including investor/media relations . . . , marketing, branding and corporate responsibility initiatives" (id.).
On or about July 20, 2009, Gonick and ARMI entered into a written employment and compensation agreement ("2009 Agreement"), pursuant to which Gonick would receive 0.4% (40 basis points) annually of all new money raised by the Fund, as well as one-half of the total fees charged by ARMI for the management of new individual-client accounts. At around the same time, Gonick allegedly obtained a five percent equity interest in ARMI. Through his contribution of additional capital over the years, Gonick alleges that he now is the owner of 34 of the 160 outstanding shares in ARMI.
By its terms, the 2009 Agreement was set to expire on September 20, 2010. Gonick alleges that, "[i]n or around August 2010, after months of negotiations and revisions, the
parties entered into a new written employment and compensation agreement ('the 2010 Agreement')" (¶ 20). "Under the terms of the 2010 Agreement, [ARMI] agreed, among other things, to employ and compensate Gonick for the life of the Fund" (¶ 21). The alleged 2010 Agreement further provided that: (a) Gonick would waive his claims to any unpaid or overdue payments under the 2009 Agreement in exchange for $10,000; (b) Gonick would be paid a specified percentage of the Fund's managed assets, distributed on a monthly basis; and (c) Gonick would have sole discretion and control over the Fund's marketing budget, but would personally fund certain of ARMI's marketing expenses.
Plaintiff alleges that the parties operated under the terms of the 2010 Agreement for approximately four years, "with Gonick performing his marketing and other obligations and
[ARMI] paying Gonick in accordance with the payment scale outlined in the 2010
Agreement" (¶ 27). However, Gonick alleges that ARMI breached the 2010 Agreement as of May 2, 2014 by discharging him from employment and refusing to allow him to continue performing under the alleged agreement.
On the basis of the foregoing allegations, Gonick's first cause of action seeks a [*3]declaration that the 2010 Agreement is enforceable and that he is entitled to continued employment with ARMI for the life of the Fund. The second cause of action seeks damages against ARMI under a contractual theory, alleging that ARMI breached the 2010 Agreement by terminating his employment. The third and fourth causes of action, seeking recovery in quantum meruit and unjust enrichment respectively, allege that Gonick rendered marketing and other services to ARMI in the belief that he would be compensated and reimbursed pursuant to the 2010 Agreement. Finally, the fifth cause of action alleges that defendants fraudulently misrepresented the enforceability of the 2010 Agreement.
ANALYSIS
Summary judgment is a drastic remedy and should be granted only if there are no material issues of disputed fact (see Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]). In evaluating a motion for summary judgment, a court should simply determine whether, viewing the evidence in the light most favorable to the nonmoving party, material issues of disputed fact preclude the grant of judgment as a matter of law (see Red Zone LLC v Cadwalader, Wickersham & Taft LLP, 27 NY3d 1048, 1049 [2016]). The party moving for summary judgment has the initial burden of coming forward with admissible proof to support the motion, so as to warrant the Court directing judgment in the movant's favor; the burden then shifts to the opposing party to demonstrate, by competent evidence, the existence of any factual issue requiring a trial of the action (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).
A.Claims Based on the Alleged 2010 Agreement
The second cause of action alleges that ARMI breached the 2010 Agreement by terminating him without cause on or about May 2, 2014. Specifically, Gonick alleges that, "[i]n or around August 2010, after months of negotiations and revisions," the parties entered into the 2010 Agreement (¶ 20), which contractually obliges ARMI to employ and compensate Gonick for the "life of the Fund" (¶ 43). The first cause of action seeks a declaration that the 2010 Agreement is valid and enforceable. 
In seeking dismissal of the claims, defendants argue that the 2010 Agreement is not an enforceable agreement to employ and compensate Gonick "for the life of the Fund" and, in any event, the unsigned agreement is void under the statute of frauds.
1.Background
The 2010 Agreement sued upon by Gonick is an unsigned, one-page document that he prepared and delivered to Roeder and Reiner.[FN2]
The document, which is captioned "Steve Gonick's Employment Agreement," consists of five principal elements:
Compensation due under 2009 Agreement. Gonick agreed to waive unpaid compensation due to him under the 2009 Agreement through June 30, 2010, in exchange for a lump-sum payment of $10,000.
Marketing expenses. Gonick agreed to set up and fund a marketing budget for ARMI that he would control. Certain types of marketing expenses would be funded solely from this marketing budget, and other specified types of marketing expenses would be shared equally [*4]between the marketing side of ARMI and the portfolio/investment management side of the company.
Gonick's compensation. ARMI agreed to compensate Gonick based on a percentage of the assets under management by the Fund. Specifically, the following schedule is provided: (a) up to $50 million: 0.2% (20 basis points); (b) up to $80 million: 0.25% (25 basis points); (c) up to $200 million: 0.3% (30 basis points); and (d) greater than $200 million: 0.35% (35 basis points).
Duration. The proposed Agreement provides that ARMI's obligation to pay Gonick compensation shall continue for the "life of the Fund." There are no other provisions for termination of the alleged employment agreement.
Louis Morizio. The 2010 Agreement includes certain provisions relating to Louis Morizio, another ARMI shareholder who is in litigation with ARMI. Specifically, the document states that Gonick's equity stake in ARMI cannot be diluted by a buy-out of Morizio and includes handwritten language apparently concerning legal fees relative to Morizio.
Having discussed the elements that appear in the 2010 Agreement, it is important to note what does not appear. There is no specific identification of the contracting parties (other than the document being captioned "Steve Gonick's Employment Agreement"); the document is not signed or initialed by Gonick or any representative of ARMI; there are no provisions for termination of the alleged agreement while the Fund remains in existence; there is neither a fixed starting date nor a fixed end date for Gonick's employment; and there is no description of the terms and conditions of Gonick's employment or delineation of his duties and responsibilities as an ARMI employee. In contrast, the 2009 Agreement identifies the parties, establishes a fixed term of employment, includes termination provisions, and is signed and initialed both by Gonick and a representative of ARMI.
Challenging Gonick's allegation that, "[i]n or around August 2010, after months of negotiations and revisions, the parties entered into" the 2010 Agreement (Complaint ¶ 20), defendants submit proof, principally in the form of contemporaneous emails and Gonick's deposition testimony, showing that negotiations regarding Gonick's employment and compensation had not culminated in a binding agreement anytime in August 2010:
A June 21, 2010 email from Gonick to Roeder and Reiner enclosed an outline of an employment/compensation agreement, but Gonick acknowledged that "this is not a contract yet, just discussion points" (Higgs Aff., Ex. C).
In a July 8, 2010 email to Reiner, Gonick states, among other things, that he "only gets paid for selling the Fund during the time he was employed" by ARMI (id., Ex. J).
On July 21, 2010, at a time when Gonick perceived "a lack of clarity" regarding his "relationship with ARMI" (id., Ex. I, pp. 111-112), Gonick sent Reiner a long email expressing concerns about the status of his proposed agreement and establishing a July 31, 2010 "deadline from [his] family" for a productive discussion with ARMI regarding a long-term agreement that [*5]would "clarify" his situation (id., Ex. K).
On August 16, 2010, Gonick again requested "clarification" from Reiner and Roeder on the "framework" for employment and compensation that the parties were discussing (id., Ex. L), and Gonick concedes that an employment/compensation agreement was not in place as of such date (id., Ex. I, pp. 115-119).
On August 26, 2010, Gonick continued to express frustration that the parties had not yet reached agreement on his employment and compensation agreement, complaining that "these issues should have been put to bed long ago" (id., Ex. M; see id. Ex. I, pp. 120-122). Gonick admits that he had not yet reached an agreement with ARMI at this point (id., Ex. I, p. 131).
In an August 30, 2010 email to Roeder and Harold Iselin, a personal friend of Gonick's who also served as corporate counsel to ARMI, Gonick enclosed a copy of the alleged 2010 Agreement, which he described as "Steve's revised agreement" (id., Ex. H). When asked whether he had an employment agreement with ARMI as of August 30, 2010, Gonick responded that "it doesn't appear [he] did" (id., Ex. I, p. 141).
Defendants' proof further demonstrates, prima facie, that the parties met with Attorney Iselin, ARMI's corporate counsel either in person or telephonically on August 30, 2010. Roeder testified that the inability of ARMI and Gonick to come to terms on an employment agreement was raised at the meeting with counsel, and Attorney Iselin advised them that "[ARMI is a] small company, there are many moving parts, you are too small for this, let's table [the issue of Gonick's proposed employment agreement] and you guys get together and work something out" (id., Ex. O, p. 119).
On the day following the meeting with counsel, August 31, 2010, Gonick emailed Roeder and Reiner to propose that he be paid 0.2% (20 basis points) of the Fund's assets on a monthly basis as "a productive interim step . . . until we work this out" (id., Ex. N; see id., Ex. I, p. 142-143). While Gonick does not specifically recall the August 30, 2010 meeting with Attorney Iselin or the advice allegedly given by ARMI's counsel and his personal friend (id., Ex. I, pp. 133-134, 139-140), Gonick does acknowledge that he proposed the interim compensation agreement to Roeder and Reiner on August 31, 2010 after "mulling over what Harold [Iselin] said" (id., Ex. N; see id., Ex. I, p. 142).
With respect to the period after August 2010, defendants assert that the parties moved forward under the interim approach suggested by Gonick in his August 31, 2010 email.
Specifically, ARMI claims that the interim agreement was to compensate Gonick off of the proposed basis point grid in the 2010 Agreement, of which 0.2% was the applicable percentage at the time (see id., Ex. O, p. 119). With respect to marketing expenses, it was defendants' understanding that "we would haggle about the marketing expenses," but ARMI expected Gonick to pay one-half of the marketing expenses out of his monthly payments, and the investment/portfolio side of ARMI's business would cover the remaining marketing expenses, [*6]consistent with the framework proposed in the 2010 Agreement (id.; see id., Ex. P, p. 38).
Thus, Gonick received monthly paychecks from ARMI for the period from September 1, 2010 through May 26, 2014, totaling more than $700,000 (see id., Exs. Q & R). The amounts paid to Gonick, which generally reflect the percentages set forth on the basis point grid in the alleged 2010 Agreement, were reduced by the marketing expenses that he agreed to share with ARMI's portfolio/investment side (see e.g. Koenig Aff., Ex. 3, pp. 81-85). Gonick also received more than $100,000 in expense reimbursement during the same period (see Higgs Aff., Ex. Q).
Defendants contend that the parties' relationship remained stable until early 2012, at which time disagreements arose regarding the marketing budget and responsibility for marketing expenses. On January 24, 2012, Gonick sent Reiner and Roeder an email purporting to summarize a discussion with Roeder regarding the issue (see id., Ex. T). Reiner then sent Gonick a copy of the 2010 Agreement the following day in an email bearing the subject: "per your request" (id., Ex. S). Gonick quickly responded as follows: "Thanks for submitting. My paperwork clarified your notes after the meeting. I am in agreement with your understanding of this deal" (id.). However, Gonick's response also raised the issue of whether ARMI would pick up his share of the marketing expenses when the Fund reached $80 million in assets, and it closed as follows: "Now honor the deal that is working. We are in agreement with the terms that have been in place . . . since 2010" (id.). Reiner then replied as follows: "We are glad you recognize the agreement as we understood it from 2010" (id.). These discussions continued, with Gonick sending Roeder and Reiner a long email regarding the marketing budget that, among other things, stated: "Gonick, Reiner and Roeder agree that the current agreement is intact" (Higgs Aff., Ex. T). Roeder replied a few days later: "We are not quite on the same page yet" (id.).
According to Reiner, his transmittal of the 2010 Agreement to Gonick came after a heated meeting regarding marketing expenses in which Gonick claimed that there was no basis for ARMI to demand that Gonick assume the full cost of marketing once Fund assets reached $80 million (see Higgs Aff., Ex. P, pp. 217-218). Reiner recalled a prior discussion of the issue and Gonick did not, so Reiner located and transmitted the 2010 Agreement, which does include a handwritten notation referring to a reallocation of marketing expenses after the Fund's assets grew to over $80 million (see id.).
Defendants claim that following these disputes regarding marketing expenses, Gonick began acting in a manner contrary to ARMI's interests, citing his refusal to appear at certain marketing presentations in 2012 and 2013 and the content of certain presentation materials prepared by him (see Higgs Aff., Exs. U & V). Despite alleged efforts to find common ground with Gonick, defendants claim that the parties' relationship continued to erode and became "toxic" (id., Ex. P, p. 80). Following Gonick's unsuccessful attempt to terminate a fellow ARMI employee, Gonick's employment with ARMI was terminated effective May 2, 2014.
It is Gonick's contention that there was a meeting of the minds as to the 2010 Agreement, regardless of whether ARMI's assent came in August 2010 or sometime thereafter; the parties performed under the 2010 Agreement for almost four years; and defendants expressly acknowledged and confirmed the terms of the alleged 2010 Agreement in the January 2012 email string quoted above. 
With respect to his allegations of the parties' performance under the 2010 Agreement, [*7]Gonick cites evidence showing that he was compensated in general accordance with the basis point grid set forth in the 2010 Agreement and that marketing expenses were allocated between Gonick and ARMI in general conformance with the 2010 Agreement (see Koenig Aff., Exs. 11, 13-14, 16-20; Higgs Aff., Exs. Q, T; see generally Koenig Aff., Ex. 3). Thus, as the assets under the Fund's management increased, Gonick's compensation as a percentage of such assets increased. Such proof is said to refute defendants' allegation that the interim arrangement proposed by Gonick on August 31, 2010 was controlling. Gonick also cites the fact that he relinquished compensation to which he was entitled under the 2009 Agreement.
2.Analysis
"To be an effective and valid employment contract, all the essential elements thereof must be shown. These elements consist of the identity of the parties, the terms of employment, which include the commencement date, the duration of the contract and the salary" (Merschrod v Cornell Univ., 139 AD2d 802, 805 [3d Dept 1988] [internal citation omitted]; see Durso v Baisch, 37 AD3d 646, 647 [2d Dept 2007]).
Under New York law, "the rule is settled that unless a definite period of service is specified in the contract, the hiring is at will and the [employer] has the right to discharge and the [employee] to leave at any time" (Watson v Gugino, 204 NY 535, 541 [1912]). Thus, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party" (Sabetay v Sterling Drug, 69 NY2d 329, 333 [1987]). "The at-will presumption may be triggered when an employment agreement fails to state a 'definite period of employment,' 'fix[] employment of a definite duration,' 'establish[] a fixed duration' or is otherwise 'indefinite'" (Rooney v Tyson, 91 NY2d 685, 689 [1998]).
In addition, where the alleged employment contract "[b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime" (General Obligations Law § 5-701 [1]), "a writing must identify the parties, describe the subject matter, state all the essential terms of an agreement, and be signed by the party to be charged" (Durso, 37 AD3d at 647 [internal quotation marks and citation omitted]). "In order to remove an agreement from the application of the statute of frauds, both parties must be able to complete their performance of the contract within one year" (Sheehy v Clifford Chance Rogers & Wells LLP, 3 NY3d 554, 560 [2004] [citations omitted]; see Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998]).
Under the alleged employment contract sued upon by Gonick, there is no period of service defined by fixed commencement [FN3]
and termination dates. Rather, ARMI's purported obligation to employ and compensate Gonick continues "for the life of the Fund." According to Gonick's own testimony, "[t]here is no set formula" for determining the life of the Fund (Higgs Aff., Ex. I, p. 30), there is no way to know when or if the Fund will dissolve, and there is "[n]o way to say" whether the Fund will remain in existence for the rest of Gonick's lifetime (or even beyond) (id. pp. 40-41). Thus, defendants have shown, prima facie, that the alleged 2010 Agreement does not fix Gonick's employment to any definite period of service.
In his opposition, Gonick places great weight on the Court of Appeals' decision in [*8]Rooney, wherein a contract to render personal services throughout the career of a professional heavyweight boxer was held to be sufficiently definite to render the at-will doctrine inapplicable: "New York's jurisprudence is supple and realistic, and surely not so rigid as to require that a definite duration can be found only in a determinable calendar date. Thus, although the exact end-date of [the boxer's] professional . . . career was not precisely calculable, the boundaries of beginning and end of the employment period are sufficiently ascertainable," particularly where the compensation to be paid under the contract "was expressly linked to a percentage of [the boxer's] earnings within the professional career measuring rod" (91 NY2d at 692).
Unlike the agreement in Rooney, in which the obligation to compensate the trainer
could last no longer than the professional career of a heavyweight prizefighter — an inherently limited duration — there is no outer bound on ARMI's alleged obligation to employ and compensate Gonick under the 2010 Agreement. Gonick's entitlement to employment and compensation would continue throughout the lifetime of an Ohio business trust, which may well exceed Gonick's lifetime or the lifetime of anyone else in being.[FN4]
Moreover, the compensation to be paid under the alleged employment agreement is not linked to Gonick's efforts or even those of ARMI. Rather, the alleged agreement would entitle Gonick to continued compensation on all monies invested in Fund, regardless of whether Gonick and/or ARMI played any role in placing the investors into the Fund and regardless of whether any of the investors placed into the Fund by Gonick and/or ARMI remain invested.
To be sure, "[a]n agreement can establish a fixed duration even if its duration cannot be determined ab initio, . . . as long as the duration 'is delimited by legally and realistically cognizable boundaries'" (Reddington v Staten Island Univ. Hosp., 511 F3d 126, 137 [2d Cir 2007], quoting Rooney, 91 NY2d at 691). In the Court's view, ARMI's alleged contractual promise to employ and compensate Gonick for the life of a third-party mutual fund lacks the type of "legally and realistically cognizable boundaries" that are "experientially limited and ascertainable by objective benchmarks" (Rooney, 91 NY2d at 691-692). In other words, "[w]hatever the precise limits of the doctrine enunciated in Rooney, the [promise allegedly] made to [Gonick] clearly lie[s] outside of them" (Reddington, 511 F3d at 138). Based on the foregoing, the Court concludes that the term "life of the Fund" lacks sufficient definiteness to render inapplicable the presumption of at-will employment.
Moreover, even if the alleged 2010 Agreement were construed as a valid employment contract for a definite period of employment, which it is not, defendants have established that the unsigned agreement is void under the statute of frauds. It has long been the law of New York that the statute of frauds is applicable to employment contracts to pay commissions on customer accounts brought in by an employee for so long as the account remained active with the employer (see e.g. Zupan v Blumberg, 2 NY2d 547, 549 [1957]). In holding that a contract to pay post-termination commissions "is not by its terms performable within a year," the Court of Appeals emphasized that "performance is dependent, not upon the will of the parties to the contract, but upon that of a third party" (id. at 550; accord Gersten-Hillman Agency, Inc. v Heyman, 68 AD3d 1284, 1287 [3d Dept 2009]; Currier v Prudential Ins. Co. of Am., 266 AD2d 596, 597 [3d Dept [*9]1999]; compare Bennett v Atomic Prods. Corp., 74 AD3d 1003, 1004-1005 [2d Dept 2010] [obligation to pay royalties terminable when defendant ceased selling plaintiff's products]).
Here, ARMI's alleged obligation to pay commissions to Gonick under the 2010 Agreement encompasses customers placed in the Fund through Gonick's efforts, and there is nothing in the 2010 Agreement that allows the parties to terminate the alleged contract for cause or convenience.[FN5]
ARMI's alleged obligation to employ and compensate Gonick continues until the Fund is dissolved, a contingency that is dependent not on the actions of the parties to this case, but solely on the actions of third parties, including Adirondack Funds, its trustees, governmental regulators and, of course, the Fund's customers. And while it is theoretically possible that the Fund could have terminated its existence within one year of the alleged making of the 2010 Agreement,[FN6]
the same is true of cases like Zupan, since the third-party customers brought in by the plaintiff were free to have terminated their accounts with the defendant-employer within one year of the alleged oral employment agreement (see 2 NY2d at 549). And while "termination of the contract within a year might result if defendant's business were dissolved or otherwise ended, . . . termination is not performance, but rather the destruction of the contract . . . . where there is no provision authorizing either of the parties to terminate as a matter of right" (id. at 550 [internal quotation marks and citations omitted]).[FN7]

In this connection, the Court emphasizes that sound policy considerations support the Court of Appeals' decision to apply the statute of frauds to unsigned employment agreements that purport to impose compensation obligations of a perpetual nature on employers. The requirement of a signed writing serves to "prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury" (Sheehy, 3 NY3d at 560 [internal quotation marks and citation omitted]; see Burns v McCormick, 233 NY 230, 234 [1922, Cardozo, J.] ["The peril of perjury and error is latent in the spoken promise"]). 
These concerns are particularly acute in a case like this, where Gonick's complaint alleges [*10]that he reached a contractual agreement with ARMI in or about August 2010, but he now admits that no agreement had been reached with ARMI by August 31, 2010; he cannot identify when ARMI assented to the alleged employment agreement; and his contractual claim is based primarily on partial performance that is highly equivocal, since there are no words or conduct on the part of defendants that are referable to any obligation on the part of ARMI to employ and compensate Gonick for the "life of the Fund." Thus, while Gonick claims that "the parties performed in a manner that can only be explained by a meeting of the minds . . . as to the 2010 Agreement" (Opp. MOL, pp. 8-9), he does not seriously address the alternative explanation testified to by defendants: that the parties adopted Gonick's August 31, 2010 suggestion of an "interim" approach that borrowed financial elements from the 2010 Agreement proposed by Gonick. The alleged 2010 Agreement is exactly the type of contract that can and must be reduced to a signed writing.
Having concluded that the 2010 Agreement is subject to the statute of frauds, the Court further concludes that Gonick has failed to come forward with proof of a signed writing (or series of signed writings) that contains its material terms. In particular, the Court rejects Gonick's contention that the 2010 Agreement was subscribed to by ARMI when Reiner forwarded the document to Gonick in January 2012 (see infra).
For all of the foregoing reasons, Gonick's first and second causes of action are dismissed.
B.Quasi Contract
Gonick's third cause of action seeks recovery in quantum meruit as against ARMI. Gonick alleges that he rendered marketing services to the Fund and forwent compensation under the 2009 Agreement under the belief that he would be compensated and reimbursed under the 2010 Agreement for the life of the Fund (see Complaint, ¶¶ 49-54). The fourth cause of action, alleging unjust enrichment, claims that Gonick "was either not compensated or drastically undercompensated" for the services rendered and contributions made to ARMI, and it would be inequitable to allow ARMI to retain the benefit of his services and contributions if the 2010 Agreement is found unenforceable (see id. ¶¶ 58-62).
"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned" (IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009] [internal quotation marks and citation omitted]). "A cause of action for unjust enrichment requires a showing that (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff" (Clifford R. Gray, Inc. v LeChase Constr. Servs., LLC, 31 AD3d 983, 987-988 [3d Dept 2006] [citations omitted]). "A cause of action for quantum meruit requires a showing of a plaintiff's performance of services in good faith, acceptance of those services by a defendant, an expectation of compensation and proof of the reasonable value of the services provided" (Hyman v Schwartz, 127 AD3d 1281, 1282 [3d Dept 2015] [internal quotation marks and citations omitted]). 
In moving for dismissal of the quasi-contractual claims, defendants first observe that
Gonick was, in fact, compensated for the marketing services rendered to ARMI and reimbursed for employment-related expenses. Thus, defendants cite proof showing that Gonick received $712,783 in compensation and $132,594 in reimbursements during the period at issue (see Higgs [*11]Aff., Exs. Q, R). Defendants also argue that insofar as Gonick is relying upon the failed 2010 Agreement in seeking to obtain commissions "for the life of Fund," he is attempting recover on an unenforceable contract that is barred both by the statute of frauds (see Zeising v Kelly, 152 F Supp 2d 335, 345 [SDNY 2001]) and the at-will employment doctrine (see Holahan v 488 Performance Group, Inc., 140 AD3d 414, 415 [1st Dept 2016]).
As an initial matter, it is apparent that Gonick cannot recover the benefit of his alleged bargain under the 2010 Agreement through his quasi-contractual claims. Recovery in quasi contract is restitutionary in nature and generally is limited to the reasonable value of the services or contributions rendered by the plaintiff to the defendants (see Davis v Cornerstone Tel. Co., LLC, 78 AD3d 1263, 1264 [3d Dept 2010]; Waldman v Englishtown Sportswear, 92 AD2d 833, 836 [1st Dept 1983]). Further, it is well settled that a party cannot use a failed contract to establish the reasonable value of the services or contributions rendered (see Isaacs v Incentive Sys., 52 AD2d 550, 550 [1st Dept 1976]). 
Notwithstanding the relief requested in the Complaint, Gonick concedes in his opposition to the motion that he cannot use his quasi-contractual claims to pursue the benefit of his alleged bargain under the 2010 Agreement or use the alleged agreement in fixing the reasonable value of his services and contributions to ARMI. Instead, Gonick seeks to recover
the reasonable value of his services from July 2009 through May 2014 and his out-of-pocket costs (see Opp. MOL, p. 21). Thus, the issue becomes whether defendants have demonstrated their entitlement to dismissal of the quasi-contractual claims, as so limited.
While a party may not recover in quasi contract for amounts in excess of that to which he or she was entitled under binding agreements (see Freedman v Pearlman, 271 AD2d 301, 304 [1st Dept 2000]; Cannon v First Natl. Bank of E. Islip, 98 AD2d 704, 705 [2d Dept 1983], affd 62 NY2d 1003 [1984]), the existence and nature of the contractual relationship between Gonick and ARMI, if any, cannot be summarily determined on the present record. Defendants deny assenting to the failed 2010 Agreement and claim that the parties' relationship is governed by "interim" agreements and understandings, a contention that Gonick denies. And even if these alleged "interim" agreements were proven to govern the subject matter of the instant dispute, the present record reveals "a factual dispute as to whether [defendants] promised, and [Gonick] expected, compensation above and beyond [his] salary for [his] role in" marketing the Fund on behalf of ARMI (Silipo v Wiley, 138 AD3d 1178, 1180 [3d Dept 2016]; cf. Robinson v Munn, 238 NY 40, 43 [1924]). Moreover, given Roeder and Reiner's testimony that they did not believe that their words or conduct manifested ARMI's assent to the 2010 Agreement, Gonick's quasi-contractual claims do not necessarily depend on proof of the failed contract (see Farash v Sykes Datatronics, 59 NY2d 500, 503 [1983]).[FN8]

Accordingly, the Court concludes that defendants have failed to eliminate all material issues of fact concerning Gonick's quasi-contractual claims. Specifically, the present record shows disputed issues of fact concerning the existence and nature of any contractual agreements between Gonick and ARMI, whether defendants promised and Gonick expected compensation [*12]beyond that provided to him under any "interim" agreements, whether Gonick's quasi-contractual claims are sufficiently distinct from any contractual agreements between Gonick and ARMI found to have been in effect, and "the reasonable value of [Gonick's] services, which may be more than, less than, or the same as the compensation that [he] has already received" (Longo v Shore & Reich, Ltd., 25 F3d 94, 98 [2d Cir 1994]).
C.Fraud
Gonick's fifth cause of action alleges fraudulent misrepresentations by Roeder and Reiner. On such a claim, plaintiff bears the ultimate burden of establishing "a misrepresentation or a material omission of fact which was false and known to be false by [defendants], made for the purpose of inducing [plaintiff] to rely upon it, justifiable reliance of [plaintiff] on the representation or material omission, and injury" (Bynum v Keber, 135 AD3d 1066, 1067-1068 [3d Dept 2016] [internal quotation marks and citations omitted]).
Gonick alleges that the parties began negotiating a new employment agreement for him in June 2010, and "in or around August 2010," he was "led to believe by Defendants Roeder and Reiner that the parties' negotiations had resulted in an enforceable contract in the form of the 2010 Agreement" (Complaint ¶ 66). In the years that followed, Roeder and Reiner are alleged to have affirmatively misrepresented "that they viewed the 2010 Agreement as an enforceable agreement and that Gonick would be compensated and reimbursed pursuant to its terms for the life of the Fund" (id. ¶¶ 67-68). Relatedly, Gonick claims to have expressed his belief that the 2010 Agreement was enforceable and governing the parties' relationship to Roeder and Reiner on multiple occasions, but they failed to correct him or convey their contrary belief, thereby misleading Gonick by omission (see id. ¶¶ 69-70). Gonick claims that the alleged misrepresentations and concealments were made to induce him into continuing to perform under the terms of the 2010 Agreement and that he actually and justifiably relied upon the alleged misrepresentations by, among other things, working at a reduced rate of compensation and foregoing certain reimbursements (see id. ¶¶ 73-75).
In moving for dismissal, defendants cite proof demonstrating that Gonick did not believe that the parties' negotiations had culminated in an enforceable contract in the form of the 2010 Agreement as of August 31, 2010 (see e.g. Higgs Aff., Exs. C, H, J-N; Ex. I, pp. 111-112, 115-119, 120-122, 131, 141-143; see also supra). Defendants also submit proof demonstrating that the January 2012 emails were sent in reference to the parties' interim agreements and understandings regarding the marketing budget and responsibility for marketing expenses — not in reference to the purported 2010 Agreement — and even as to these limited issues, the parties "were not quite on the same page yet" (Higgs Aff., Exs. S, T; see id., Ex. P, pp. 217-218). Relatedly, defendants argue that there is no evidentiary basis for finding that they acted with scienter and, in any event, the fraud claim merely is a repackaging of Gonick's failed contractual claim. 
In opposition, Gonick argues principally that the Court already rejected the argument that the fraud claim is redundant of the contractual claim in granting him leave to amend the original complaint (see Decision & Order dated March 16, 2016), and he cites authorities holding that questions of intent generally are for the trier of fact to resolve.
The Court concludes that the proof adduced by defendants suffices to demonstrate their prima facie entitlement to dismissal of the fraud claim, and Gonick has failed to raise a triable [*13]issue of fact in opposition. The record conclusively demonstrates the falsity of Gonick's allegation that, "in or around August 2010," he was "led to believe by . . . Roeder and Reiner that the parties' negotiations had resulted in an enforceable contract in the form of the 2010 Agreement" (Complaint ¶ 66). Indeed, with the exception of a few equivocal emails sent years after these negotiations, Gonick does not and cannot point to any specific statement by Roeder or Reiner by which ARMI allegedly manifested its assent to the 2010 Agreement.
And with respect to the emails cited by Gonick, there is no fair view of the evidence
that would allow the trier of fact to find by clear and convincing evidence that any of Roeder and Reiner's alleged misrepresentations or concealments were made with fraudulent intent. While the question of scienter ordinarily is one for the fact-finder, settled law holds that claims of fraud must be established by "clear, positive and convincing evidence," and the claim must be rejected where "the evidence is loose, equivocal or contradictory" (George Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 219-220 [1978] [internal quotation marks and citations omitted]; see Abrahami v UPC Constr. Co., 224 AD2d 231, 233 [1st Dept 1996]).
Even viewed in a light most favorable to Gonick and with the benefit of all reasonable inferences, the January 2012 email exchange simply is too equivocal to raise a triable issue of fact as to whether Roeder and Reiner fraudulently misrepresented the status of the 2010 Agreement in order to deceive Gonick. The subject matter of the emails is ARMI's marketing budget and the allocation of responsibility for marketing expenses; Reiner's statement that defendants were "glad [that Gonick] recognize[d] the agreement as [they] understood it from 2010" is consistent with defendants' testimony regarding the existence of an "interim" agreement, as proposed by Gonick in his August 31, 2010 email; and even as to the issue of the marketing budget and responsibility for marketing, Roeder and Reiner still were not "on the same page" with Gonick as of late January 2012 (Higgs Aff., Exs. S, T [emphasis added]).[FN9]

In any event, even if Gonick had come forward with proof sufficient to raise a triable issue of fact as to a misrepresentation and/or concealment made by Roeder or Reiner with scienter, it is apparent from the present record that the fraud claim is redundant of his quasi-contractual and contractual causes of action.[FN10]
In a fraud case, the proper measure of damages is [*14]"plaintiff's actual pecuniary loss as a result of the fraud, or what is known as the 'out-of-pocket' rule. 'Damages are to be calculated to compensate plaintiff[] for what [he] lost because of the fraud, not to compensate [him] for what [he] might have gained'" (Kaddo v King Serv., 250 AD2d 948, 949-950 [3d Dept 1998], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]; see Route 217, LLC v Greer, 119 AD3d 1018, 1020 [3d Dept 2014]). 
Thus, insofar as Gonick sustained actual pecuniary loss as a result of the alleged fraud, the damages he claims — working at a reduced rate of pay, foregoing certain reimbursements and incurring out-of-pocket expenses on behalf of ARMI (see Complaint ¶¶ 74-75) — are identical to the damages that he seeks on his quasi-contractual causes of action. Moreover, the fraud claim is predicated upon essentially the same factual allegations as the contractual and quasi-contractual causes of action: that defendants' words and conduct led Gonick to believe that he would receive compensation and reimbursement from ARMI beyond that provided to him under any "interim" agreements. And, of course, the fraud claim cannot survive if the parties did reach mutual agreement on an employment contract. Thus, the fraud claim is subject to dismissal in any event (see Demov, Morris, Levin & Shein v Glantz, 78 AD2d 883, 884 [1st Dept 1980], affd 53 NY2d 553 [1981]).
Based on the foregoing, the cause of action alleging fraud is dismissed.
CONCLUSION
Accordingly, it is
ORDERED that defendants' motion is granted in part and denied in part, in accordance with the foregoing, and plaintiff's first, second and fifth causes of action are dismissed; and finally it is
ORDERED that the parties are directed to appear for a conference on October 19, 2017 at 10:30 a.m. for, among other things, the purpose of selecting a trial date on the remaining causes of action.
This constitutes the Decision and Order of the Court. The original of this Decision and Order is being transmitted to plaintiff's counsel; all other papers are being transmitted to the Albany County Clerk. The signing of this Decision and Order shall not constitute entry or filing under CPLR Rule 2220. Counsel is not relieved from the applicable provisions of that Rule respecting filing, entry and Notice of Entry.
Dated: Albany, New York
September 20, 2017
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Nos. 90-140



Footnotes

Footnote 1:Alicia Lasch originally was named as a defendant, but no claims remain pending against her.

Footnote 2:The record includes multiple versions of a proposed employment and compensation agreement (see Higgs Aff., Exs. D, E, F, G and H).

Footnote 3:The 2009 Agreement did not expire until September 20, 2010, and the 2010 Agreement waived Gonick's claims for compensation under the 2009 Agreement only through June 30, 2010.

Footnote 4:It is unclear whether Gonick believes that ARMI's obligations under the 2010 Agreement would survive his death.

Footnote 5:Gonick appears to assert that he, but not ARMI, had the right to terminate the 2010 Agreement, notwithstanding the absence of any termination provision. But even if that were so, it would not take the alleged contract outside the statute of frauds absent a corresponding termination right on the part of ARMI, the party to be charged (see South Cherry St., LLC v Hennessee Group LLC, 573 F3d 98, 105-107 [2d Cir 2009] [collecting authorities]).

Footnote 6:The Court observes that the obligation to compensate Gonick for the "life of the Fund" literally is one that "[b]y its terms . . . the performance of which is not to be completed before the end of a lifetime" (General Obligations Law § 5-701 [1]; see Meltzer v Koenigsberg, 302 NY 523, 525 [1951] [statute does not refer to the lifetime of "the party to be charged, or the lifetime of any particular person"]). Of course, the lifetime is that of an Ohio business trust, not a natural person.

Footnote 7:Indeed, the purported termination event here — the dissolution of the Fund — is itself illusory and unnecessary, since the Fund's termination would leave no assets under ARMI management, thereby obviating any duty on the part of ARMI to compensate Gonick according to the asset-based fee schedule and eliminating any need for marketing.

Footnote 8:Nor is this case like Zeising, where the plaintiff was attempting to recover for services of a type that must be delivered pursuant to a signed writing (see 152 F Supp 2d at 344-345; cf. Silipo v Wiley, 138 AD3d 1178, 1180 [3d Dept 2016]).

Footnote 9:For similar reasons, the Court is unpersuaded by the other emails cited by Gonick, which are equally susceptible to the construction that the parties had reached agreement on certain "interim" employment and compensation-related issues addressed in the 2010 Agreement but not the entire 2010 Agreement.

Footnote 10:The Court rejects Gonick's contention that the law of the case doctrine bars the Court from considering this argument. In fact, the prior decision specifically recognized that "the fraud claim ultimately may be shown to be redundant of plaintiff's quasi-contractual remedies," but that "plaintiff should be permitted to proceed on alternative theories" at the pleading stage of the litigation. Moreover, as defendants observe, the standard on a motion to amend simply is whether there is "some evidence of merit" (Chianis & Anderson Architects, PLLC v Courterback Dev. Co., LLC, 140 AD3d 1286, 1289-1290 [3d Dept 2016] [internal quotation marks and citation omitted], lv dismissed and denied 28 NY3d 1021 [2016]), and "[a] summary judgment standard is not to be applied" (Bast Hatfield, Inc. v Schalmont Cent. School Dist., 37 AD3d 987, 988 [3d Dept 2007]; see James v R & G Hacking Corp., 39 AD3d 385, 386 [1st Dept 2007], lv denied 9 NY3d 814 [2007]).